# TURNER *v.* UNITED STATES AND CREEK NATION OF INDIANS.

## APPEAL FROM THE COURT OF CLAIMS.

No. 33.  Argued November 13, 14, 1918.—Decided January 7, 1919.

While recognized by the United States as a distinct political community, the Creek Nation leased a pasture, the lessees undertaking to fence and pay rent. When nearly completed, the fence was destroyed by the action of a Creek mob, participated in by the Creek Treasurer; and thereafter one of the lessees, assignee of the rest, sued the Creek Nation for the cost of the fence and of the assignments and for the loss of the benefits of the lease. *Held,* that there was no cause of action; for a sovereignty, on general principles, is not liable for injuries resulting from mob violence or failure to keep the peace; and neither the wrong of the Treasurer nor any duty under the lease created such liability here.  P. 357.

The special Act of May 29, 1908, c. 216, 35 Stat. 444, 457, authorized suit in the Court of Claims against the Creek Nation for the adjudication of this claim, but it did not validate the claim itself or permit that the United States be joined as a defendant.  P. 358.

51 Ct. Clms. 125, affirmed.

The case is stated in the opinion.

*Mr. Chas. H. Merillat,* with whom *Mr. Chas. J. Kappler* was on the brief, for appellant.

*Mr. Assistant Attorney General Thompson* and *Mr. George M. Anderson,* for the United States, submitted.

*Mr. James C. Davis,* for the Creek Nation of Indians, submitted.

Mr. Justice Brandeis delivered the opinion of the court.

The Creek or Muskogee Nation or Tribe of Indians had, in 1890, a population of 15,000. Subject to the control of

Congress, they then exercised within a defined territory the powers of a sovereign people; having a tribal organization, their own system of laws, and a government with the usual branches, executive, legislative, and judicial. The territory was divided into six districts; and each district was provided with a judge.[1]

In 1889 the Creek Nation enacted a statute which conferred upon each citizen of the Nation, head of a family engaged in grazing livestock, the right to enclose for that purpose one square mile of the public domain without paying compensation. Enclosure of a greater area was prohibited; but provision was made for establishing, under certain conditions, more extensive pastures near the frontiers to protect against influx of stock from adjoining nations. The conditions prescribed were these: If the district judge should receive notice from citizens of a desire to establish such a pasture, he was required to call a meeting of citizens to consider and act upon the subject; and if it appeared that a majority of the persons of voting age in the neighborhood thus to be protected favored its establishment, the district judge was directed to let such pasture for three years (subject to renewal) to citizens who would by contract bind themselves to build a substantial fence around the pasture, and to pay at least five cents per acre per annum for the grazing privilege.

In 1890 Turner and a partner formed, under the name of Pussy, Tiger & Co., an organization consisting of themselves and one hundred Creeks, with a view to securing such a pasture in the Deep Fork district. They caused an election to be held and a contract to be entered into by the district judge with Pussy, Tiger & Co., which covered about 256,000 acres. The fence required to enclose it was

---

[1] Treaty of June 14, 1866, Art. X, 14 Stat. 785, 788; Report of the Commissioner of Indian Affairs for 1888, p. 113; for 1889, p. 202; for 1890, pp. 89, 90; for 1891, vol. I, pp. 240–241.

about 80 miles in length. Before its construction was begun, dissatisfaction had already developed in the neighborhood; and from the time the fence was commenced, there were rumors of threats by Indians to destroy it if built. The work was, however, undertaken; the threats continued; and Turner and one of his assignees secured from the United States Court in the Indian Territory, First Judicial Division, an injunction restraining the Creek district judge for the Deep Fork district and L. C. Perryman, the Principal Chief of the Nation, from interfering with or damaging the fence. After it had been nearly completed, three bands of Creek Indians destroyed the fence, cutting the wire and posts and scattering the staples. It does not appear that either the Creek judge or the Chief or any other official of the Creek Government had any part in the destruction of the fence, except one Moore, the Treasurer, whose only official duties seem to have been "to receive and receipt for all national funds and to disburse the same, as should be provided for by law."

More than $10,000 net expended in constructing the fence, and $2500 paid by Turner to the 100 Creek Indians associated with him for the release of their grazing rights were lost; and large profits which it was expected would be made through assignment of pasturage rights to cattle raisers were prevented. Claims for compensation were repeatedly presented by Turner to the Creek Nation. Once its National Council voted to make compensation; but Chief Perryman vetoed the action and his veto was sustained. Later the Creek supreme court declared the fence a legal structure; but still the Nation failed to make any compensation. On March 4, 1906, the tribal organization was dissolved pursuant to Act of March 1, 1901, c. 676, § 46, 31 Stat. 861, 872. In 1908 Congress provided, by § 26 of the Act of May 29, 1908, c. 216, 35 Stat. 444, 457, as follows:

"That the Court of Claims is hereby authorized to

consider and adjudicate and render judgment as law and equity may require in the matter of the claim of Clarence W. Turner, of Muskogee, Oklahoma, against the Creek Nation, for the destruction of personal property and the value of the loss of the pasture of the said Turner, or his assigns, by the action of any of the responsible Creek authorities, or with their cognizance and acquiescence; either party to said cause in the Court of Claims to have the right of appeal to the Supreme Court of the United States."

In August, 1908, Turner, having acquired all the rights of his associates, filed a petition in the Court of Claims against the Creek Nation and the United States as trustee of Creek funds,[1] to recover the amount lost, which he alleged to be the sum of $105,698.03. The Court of Claims dismissed the petition (51 Ct. Clms. 125), and the case comes here by appeal.

The claimant contends that, by the general law, the Creek Nation is liable in damages for the action of the mob which resulted in the destruction of his property and prevented him from securing the benefits of the contract entered into between him as grantee and the Creek Nation; and that if the substantive right did not already exist, it was created by the act which conferred jurisdiction upon the Court of Claims to hear and adjudicate the controversy.

*First.* No such liability existed by the general law. The Creek Nation was recognized by the United States as a distinct political community, with which it made treaties and which within its own territory administered its internal affairs. Like other governments, municipal as well as state, the Creek Nation was free from liability

---

[1] On November 18, 1915, the sum of $1,325,167.16 was held by the United States in trust for the Creek Nation of Indians. In addition thereto approximately $1,110,000.00 of the tribal funds of the Nation were on deposit in the Oklahoma state and national banks, on April 10, 1916, under the provisions of the Act of March 3, 1911, c. 210, § 17, 36 Stat. 1058, 1070.

for injuries to persons or property due to mob violence or failure to keep the peace. Compare *Louisiana* v. *Mayor of New Orleans*, 109 U. S. 285, 287, 291; *South* v. *Maryland*, 18 How. 396; *Murdock Grate Co.* v. *Commonwealth*, 152 Massachusetts, 28, 31. Such liability is frequently imposed by statute upon cities and counties (see *City of Chicago* v. *Pennsylvania Co.*, 119 Fed. Rep. 497); but neither Congress nor the Creek Nation had dealt with the subject by any legislation prior to 1908. The fundamental obstacle to recovery is not the immunity of a sovereign to suit, but the lack of a substantive right to recover the damages resulting from failure of a government or its officers to keep the peace. And the participation in the injuries of an officer acting, not *colore officii*, but in open and known violation of the law, cannot alter the case. The claimant's contention that the defendant owed to the claimant, as its own grantee, a greater duty than it owed to other persons in the territory, to protect him against mob violence, finds no support in reason or authority.

*Second.* The special Act of May 29, 1908, did not impose any liability upon the Creek Nation. The tribal government had been dissolved. Without authorization from Congress, the Nation could not then have been sued in any court; at least without its consent. The Court of Claims is "authorized to consider and adjudicate and render judgment as law and equity may require." The words of the act which follow merely identify the claims which the court is authorized to consider. Authority to sue the Creek Nation is implied; but there is nothing in the act which even tends to indicate a purpose to create a new substantive right. Compare *United States* v. *Mille Lac Chippewas*, 229 U. S. 498, 500; *Green* v. *Menominee Tribe*, 233 U. S. 558, 568; *Thompson* v. *United States*, 246 U. S. 547. The act simply provides a forum for the adjudication of such rights as Turner may have against the Creek Nation.

*Third.* The United States objected also to the jurisdiction of the court over it. Neither the special act nor any general statute authorized suit against the United States. As it cannot be sued without its consent, the United States was improperly joined as a party defendant, although in the capacity of trustee for the Creek Nation. Compare *Green* v. *Menominee Tribe, supra.*

It is not necessary to consider the many other objections urged against the petition. The Court of Claims properly dismissed it; and the judgment is

*Affirmed.*