703 P.2d 502

**VAL/DEL, INC., a Delaware corporation, Petitioner,**

**v.**

**SUPERIOR COURT of the State of Arizona, In and For the COUNTY OF PIMA, Honorable Lillian S. Fisher, a Judge thereof, Respondents,**

**and**

**PASCUA YAQUI TRIBE, Real Party in Interest.**

**No. 2 CA–SA 133.**

Court of Appeals of Arizona, Division 2.

Jan. 2, 1985.

Reconsideration Denied March 1, 1985.

Review Denied May 29, 1985.

Molloy, Jones, Donahue, Trachta, Childers & Mallamo, P.C. by John F. Molloy and David A. McEvoy, Tucson, for petitioner.

Lansdale & Kneip, P.C. by Jack L. Lansdale, Jr., Tucson, and Ussery & Parrish, P.A. by L. Lamar Parrish, John J. Carmody, Jr., and Catherine Baker Stetson, Albuquerque, for real party in interest.

## OPINION

BIRDSALL, Chief Judge.

This special action has been taken from the trial court's dismissal of the petitioner's complaint. We have accepted jurisdiction because the petitioner's remedy by appeal is not adequate and because the question presented is a matter of great significance to those who may desire to do business with the respondent tribe. See *State ex rel. Corbin v. Superior Court of Maricopa County*, 138 Ariz. 500, 675 P.2d 1319 (1984); *University of Arizona Health Sciences Center v. Superior Court of the County of Maricopa*, 136 Ariz. 579, 667 P.2d 1294 (1983).

On January 11, 1984, the real party in interest Pascua Yaqui Tribe and Val/Del, Inc., the petitioner, entered into an agreement whereby Val/Del was to manage the tribe's newly established bingo operation. The agreement called for Val/Del to be retained on an exclusive basis to finance, manage, and operate the bingo operation for the tribe for a seven-year period commencing January 1, 1984. On or about May 13, 1984, the tribe apparently excluded petitioner's employees and managers from the property, alleging the existence of certain defaults by petitioner under the management agreement.

On June 27, 1984, petitioner filed its complaint in the present lawsuit in Pima County Superior Court seeking to have the arbitration clause of the agreement enforced. Service was made upon the tribe on June 27, 1984, and its motion to dismiss was filed July 9 and granted on August 7. The court found that the Pascua Yaqui Indian Tribe is a federally recognized tribe entitled to sovereign immunity and cannot be

sued without having waived such immunity or otherwise granted its consent to suit. Although the trial court found that the tribe had consented to having a lawsuit between the parties tried in its tribal court, it held that the arbitration clause in the subject contract was not a legally sufficient waiver of sovereign immunity to permit the action in state court and dismissed the complaint.

The powers of Indian tribes have been described as "inherent powers of a limited sovereignty which has never been extinguished." F. Cohen, Handbook of Federal Indian Law 122 (U.N.M. ed. 1971). Before the Europeans arrived, Indian tribes were self-governing sovereign political entities. See *McClanahan v. State Tax Commission of Arizona*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). One of the inherent powers possessed by Indian tribes like all sovereign bodies, was immunity from suit. In *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), Justice Marshall stated the basis of this immunity:

"Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers.... This aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress. But 'without congressional authorization' the 'Indian Nations are exempt from suit.'" 436 U.S. at 58, (citations omitted).

Arizona courts have also recognized the doctrine of tribal sovereign immunity. In *Morgan v. Colorado River Indian Tribe*, 103 Ariz. 425, 443 P.2d 421 (1968), our supreme court held that state courts did not have jurisdiction over an Indian tribe which had allegedly committed a tort while engaging in a business enterprise in the State of Arizona but outside the boundaries of the tribal lands. The court held that the Colorado River Indian Tribe was a sovereign immune from suit and could not be subjected to the jurisdiction of Arizona courts without its consent or the consent of Congress. A similar result was reached in *White Mountain Apache Indian Tribe v. Shelley*, 107 Ariz. 4, 480 P.2d 654 (1971), and both cases were noted in the recent Division One case of *S. Unique, Ltd. v. Gila River Pima-Maricopa Indian Community*, 138 Ariz. 378, 674 P.2d 1376 (App. 1983).

We note here that sovereign immunity as discussed in these cases seems to be limited to decisions wherein jurisdiction of state and federal courts was thwarted. However, since one of the primary purposes of the doctrine of sovereign immunity is to protect tribal trust property from encumbrances, *Atkinson v. Haldane*, 569 P.2d 151 (Alaska, 1977), it must necessarily mean freedom from suit regardless of where the suit is brought. The immunity of Indian tribes, however, is not absolute. *United States v. Oregon*, 657 F.2d 1009 (9th Cir.1981). It exists only at the sufferance of Congress and is subject to complete defeasance. *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). Either explicit congressional authority or consent of a tribe is necessary to find a waiver of the immunity. *United States v. Oregon, supra.*

Petitioner's first point of attack is that the tribe does not enjoy sovereign immunity since it does not possess the requisite characteristics of a sovereign Indian nation as set forth in regulations promulgated by the Department of Interior. See 25 C.F.R. Part 83. The procedures established in those regulations, which petitioner alleges must be met before a tribe will be accorded federal recognition and therefore enjoy immunity from suit, include:

"(a) [T]he petitioner [tribe] has been identified from historical times until the present on a substantially continuous basis, as 'American Indian' or 'aboriginal.'

\* \* \* \* \* \*

(b) Evidence that a substantial portion of the petitioning group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area, and that its members are descendants of an Indian tribe

which historically inhabited a specific area.

(c) A statement of facts which establishes that the petitioner has maintained tribal political influence or other authority over its members as an autonomous entity throughout history until the present." 25 C.F.R. § 83.7.

Petitioner presented to the trial court two books [1] by Dr. Edward H. Spicer as authority for the proposition that the Pascua Yaqui Tribe would not qualify for federal recognition under the Code of Federal Regulations requirements. Spicer was an acknowledged authority on the history of the Pascua Yaquis, and his books establish that the Yaquis do not have single roots but are a historically mixed-blood people who lived in western Mexico on the Gulf of California from approximately the 1600's to the present. Beginning in the late 1880's, small groups came from time to time across the international border to Arizona and California. Therefore, petitioner argues, since the Pascua Yaquis are not indigenous to this area, but rather are immigrants from Mexico, and because Dr. Spicer's books show that the tribe has not attempted to revive any system of government their predecessors may have established in Mexico, they would not qualify for federal recognition under 25 C.F.R. § 83.7. We cannot fault this conclusion and, in essence, neither does the tribe.

The tribe relies instead on 25 U.S.C. §§ 1300f–1300f(2), which were adopted by Congress in 1978 and in which Congress recognized the Pascua Yaqui Indian people and declared them eligible

"for the services and assistance provided to Indians because of their status as Indians or through any department, agency, or instrumentality of the United States, or under any statute of the United States." 25 U.S.C. § 1300f(a)

Additionally, Congress provided that certain provisions of 25 U.S.C. §§ 461–492 entitled "Protection of Indians and Conservation of Resources," would be extended to the Pascua Yaqui Indian people. Included in that subchapter is § 479, the definition section, which recognizes the term Indian as referring to all persons of Indian descent who are members of any recognized Indian tribe now under federal jurisdiction. The Supreme Court of Alaska, in *Atkinson v. Haldane,* supra, was presented with a similar situation involving the Metlakatla community. The court found that, although the Metlakatla community had come to Alaska from British Columbia, that that was not a significant factor in view of the fact that the community had been recognized by the federal government as an organized tribe and thus should be given the protections accorded other tribes. The court stated:

"[The tribe asks] application of the principle that tribes under the tutelage of the United States are immune from suit in the absence of congressional consent. . . .

Thus, we conclude that the Metlakatla Indian Community, despite its unique history, is entitled to sovereign immunity. . . . The Community has been recognized by the United States government as an Indian tribe and has been treated accordingly. Once the executive branch has determined that the Metlakatla Indian Community is an Indian tribe, which is a nonjusticiable political question, the Community is entitled to all of the benefits of tribal status. The Supreme Court of the United States declared in *U.S. Fidelity* [*United States v. United States Fidelity & Guaranty Co.,* 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940)] that one of those benefits is tribal sovereign immunity in the absence of congressional waiver. Court decisions from *United States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886) to *McClanahan v. State Tax Commission,* 411 U.S. 164, 170–72, 93 S.Ct. 1257, 1261–62, 36 L.Ed.2d 129, 134–36 (1973) have firmly established plenary congressional power over Indian affairs. Article VI, clause 2

---

1. E. Spicer, Pascua, A Yaqui Village in Arizona (Univ. of Ariz. Press ed., 1984).

E. Spicer, The Yaquis: A Cultural History (Univ. of Ariz. Press, 1980).

of the United States Constitution provides:

'This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or laws of any State to the Contrary notwithstanding.'

The supremacy of the decisions of the Supreme Court of the United States has been recognized since *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 4 L.Ed. 97 (1816). Because of the supremacy of federal law, we are bound to recognize the doctrine of tribal sovereign immunity, even if we were to find valid public policy reasons to hold it inapplicable in this case." 569 P.2d at 162–3.

Petitioner contends that regardless of the recognition by the federal government of the Pascua Yaqui Indian people in 25 U.S.C. § 1300f, that recognition was conditioned upon the tribe's waiver of sovereign immunity because of the provisions of 25 U.S.C. § 1300f(c):

"*Provided,* That the State of Arizona shall exercise criminal and civil jurisdiction over such lands as if it had assumed jurisdiction pursuant to the Act of August 15, 1953 (67 Stat. 588), as amended by the Act of April 11, 1968 (82 Stat. 79)."

The act of August 15, 1953, referred to in subsection (c), commonly known as Public Law 280, extended to certain states criminal jurisdiction over offenses committed by or against Indians in Indian country (18 U.S.C. § 1162) and civil jurisdiction over causes of action arising in Indian country to which Indians are parties (28 U.S.C. § 1360). PL–280 apparently began as an attempt by California to extend criminal jurisdiction to all Indian lands within the state. It has been pointed out that the extension of state criminal jurisdiction was the primary thrust of the legislation and that the civil section was added without

great discussion. *Atkinson v. Haldane, supra.* PL–280 automatically transferred the jurisdiction of certain civil and criminal matters involving Indians on Indian lands to five enumerated states—California, Minnesota, Nebraska, Oregon, and Wisconsin—and tendered the same jurisdiction to all others. The statute was amended in 1968 in conjunction with the adoption of the Indian Civil Rights Act, 25 U.S.C. §§ 1301–1341 to require that future assumptions of jurisdiction by a state could be made only with the consent of the tribe in question. 25 U.S.C. §§ 1321(a) and 1322(a). The amendments also authorized the assumption by states of partial subject matter or territorial jurisdiction and permitted states which had previously accepted jurisdiction to retrocede such jurisdiction to the federal government, either in whole or in part. 25 U.S.C. §§ 1321(a) and 1322(a).

Petitioner contends that, by conferring jurisdiction over Pascua Yaqui lands to the Arizona courts pursuant to PL–280, the effect of 25 U.S.C. § 1300f(c) is to waive the tribe's immunity from suit. This contention rests on the resolution of the question of whether Congress intended PL–280 as a waiver of an Indian tribe's sovereign immunity. In *Bryan v. Itasca County, Minnesota,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the Supreme Court emphasized that the granting of state jurisdiction was not intended to "result in the undermining or destruction of such tribal governments as did exist. . . ." and concluded that "[t]he Act itself refutes such an inference: there is notably absent any conferral of state jurisdiction over the tribes themselves, . . ." 426 U.S. at 388–389, 96 S.Ct. at 2110–2111. The *Bryan* Court utilized legislative history in the wording of the act itself to determine what Congress expressly intended and decided to go no further. The Court stated:

"Of special significance for our purposes, however, is the total absence of mention or discussion regarding a congressional intent to confer upon the States an authority to tax Indians or Indian property on reservations. . . . This omission has significance in the application of the can-

ons of construction applicable to statutes affecting Indian immunities, as some mention would normally be expected if such a sweeping change in the status of tribal government and reservation Indians had been contemplated by Congress." 426 U.S. at 381.

The Court went on to state:

"[T]he consistent and exclusive use of the terms 'civil causes of action,' 'aris(ing) on,' 'civil laws ... of general application to private persons or private property,' and 'adjudicat(ion)' in both the Act and its legislative history virtually compels our conclusion that the primary intent of § 4 was to grant jurisdiction over private civil litigation involving reservation Indians in state court." 426 U.S. at 385, 96 S.Ct. at 2109.

In *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir.1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977), the Ninth Circuit Court of Appeals interpreted 28 U.S.C. § 1360 as containing an ambiguity and determined that the rules of construction dictated that all ambiguities be resolved in favor of the Indians. 532 F.2d at 660. Both the *Bryan* and *Santa Rosa Band of Indians* Courts thus adopted a narrow interpretation of the grant of jurisdiction to the states in 28 U.S.C. § 1360(a).

■ These cases were followed by the Alaska Supreme Court in *Atkinson v. Haldane*, supra, where the court concluded that the sovereign immunity of the Indian community therein could be deemed waived only if it were clear from the unambiguous language of 28 U.S.C. § 1360(a) and its legislative history that Congress intended such a waiver. The court noted that the legislative history did not specifically mention any waiver of tribal sovereign immunity and that the ambiguity present in 28 U.S.C. § 1360(a) was not resolved by the legislative history. The court found the absence of any clear waiver of sovereign immunity in the statute of controlling significance and concluded that without such an express congressional waiver of immuni-

ty, one should not be implied. The court noted that the jurisdictional grant in 28 U.S.C. § 1360(a) was limited by 28 U.S.C. § 1360(b), which provides:

"Nothing in this section shall authorize the alienation, encumbrance, or taxation of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall confer jurisdiction upon the State to adjudicate, in probate proceedings or otherwise, the ownership or right to possession of such property or any interest therein."

The court concluded that the limitation "serves the same interest that the doctrine of sovereign immunity serves, i.e., the preservation of tribal trust property from 'encumbrances.'" 569 P.2d at 167. Therefore, the court theorized, § 1360(b) demonstrated that no waiver of tribal sovereign immunity was intended by § 1360(a).

"If Congress had wanted to waive tribal immunity, it strikes us that it would have allowed execution against purely tribal assets, e.g., tribal real property. Since the underlying reasons for the restrictions in § 1360(b) are similar to the underlying reasons for tribal sovereign immunity, construing the two subsections together, we conclude that § 1360(a) does not constitute a waiver of tribal sovereign immunity." 569 P.2d at 167, n. 59.

We align ourselves with the reasoning of the courts in these cited decisions and hold that Congress, by virtue of its enactment of 25 U.S.C. § 1300f(c), which applied 28 U.S.C. § 1360(a) and its granting of civil jurisdiction to the State of Arizona over Pascua Yaqui Indian lands, did not waive

the sovereign immunity of the Pascua Yaqui Indian Tribe.[2]

■ Having concluded that the Pascua Yaqui Indian Tribe, as a federally recognized tribe, is entitled to sovereign immunity, we must now decide if it waived its immunity by agreeing to arbitrate any dispute arising out of its contract with petitioner. Section 12 of the contract provides:

"*Arbitration.* Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration in accordance with the arbitration rules of the American Arbitration Association, and judgment upon the action rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof."

A waiver of sovereign immunity cannot be implied but must be unequivocally expressed. *Santa Clara Pueblo v. Martinez,* supra, quoting *United States v. Testan,* 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), which quoted *United States v. King,* 395 U.S. 1, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). There is only one case cited to us, and our independent research has failed to turn up any other, which has addressed the precise issue of whether an arbitration clause constitutes an explicit waiver of immunity from suit. We agree with the Alaska Supreme Court in its reasoning in *Native Village of Eyak v. GC Contractors,* 658 P.2d 756 (Alaska 1983) wherein it stated:

"[W]e believe it is clear that any dispute arising from a contract cannot be resolved by arbitration, as specified in the contract, if one of the parties intends to assert the defense of sovereign immunity. To the extent possible, all provisions in a contract should be found meaningful. *Tucker v. Byler,* 27 Ariz.App. 704, 558 P.2d 732, 735 (Ariz.App.1976); *Quenzer v. Quenzer,* 225 Kan. 83, 587 P.2d 880, 882 (Kan.1978). The arbitration clause ... would be meaningless if it did

---

**2.** The tribe argued below and argues to this court that even if 25 U.S.C. § 1300f(c) had given Arizona civil jurisdiction over Pascua Yaqui Indian territory, a proclamation issued by Arizona Governor Bruce Babbitt, dated February 6, 1984, effectively returned jurisdiction to the federal government. That proclamation stated in part:

"WHEREAS, Public Law 95–375 requires the State of Arizona to exercise criminal and civil jurisdiction over Pascua Yaqui lands as if it had assumed jurisdiction ... and

WHEREAS, the State of Arizona is constitutionally prohibited from claiming jurisdiction over Indian lands pursuant to paragraph four of Article XX of the Arizona Constitution; and

WHEREAS, this constitutional disclaimer impedes the State from exercising criminal and civil jurisdiction over Pascua Yaqui lands, notwithstanding the Language in PL 95–375, 25 U.S.C. 1300(f)(c) [sic] which purports to grant such jurisdiction to Arizona;

     *    *    *    *    *    *

I, Bruce Babbitt, Governor of the State of Arizona, ... do hereby retrocede all civil and criminal jurisdiction, or purported jurisdiction, granted to the State of Arizona, pursuant to Public Law 95–375 over that area of land within this State conveyed to the Pascua Yaqui tribe from the United States and held in trust for the Pascua Yaqui tribe by the United States Secretary of the Interior, ..."

We note that the alleged retrocession of jurisdiction does not comply with the requirements of 25 U.S.C. § 1323(a) which provides that the federal government is authorized to accept a state's retrocession. To effectively retrocede jurisdiction, there must be formal acceptance of the retrocession by the Secretary of the Interior, published in the Federal Register, specifying the date of retrocession. 25 U.S.C. § 1323, note. There is nothing in the record to show acceptance by the Secretary of the Interior nor a published acceptance of same in the Federal Register. Arizona Constitution, Article 20, ¶ 4, alluded to above, provides in part that Indian lands "shall be, and remain, subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States." The real party in interest argues that therefore the Arizona Constitution precludes the state from exercising jurisdiction in this case. However, such an argument was found to be without merit in *Arizona v. San Carlos Apache Tribe of Arizona,* 463 U.S. 545, 103 S.Ct. 3201, 77 L.Ed.2d 837, *reh'g denied,* —— U.S. ——, 104 S.Ct. 209, 78 L.Ed.2d 185 (1983) wherein the Supreme Court recognized state jurisdiction, stating: "[T]he presence or absence of specific jurisdictional disclaimers has rarely been dispositive in our consideration of state jurisdiction over Indian affairs or activities on Indian lands." 103 S.Ct. at 3211. Similarly, it has been held that the language of "absolute jurisdiction and control" means "undiminished, not exclusive" jurisdiction. Organized Village of *Kake v. Egan,* 369 U.S. 60, 71, 82 S.Ct. 562, 568, 7 L.Ed.2d 573, 581 (1962); *Francisco v. State,* 113 Ariz. 427, 556 P.2d 1 (1976).

not constitute a waiver of whatever immunity [the tribe] possessed. Furthermore, under similar circumstances the Ninth Circuit Court of Appeals has held that a clause in a contract stating that the federal courts would resolve any disputes arising from the contract constituted an express waiver of a tribe's sovereign immunity. *United States v. Oregon*, 657 F.2d 1009, 1016 (9th Cir.1981). There is little substantive difference between an agreement that any dispute arising from a contract shall be resolved by the federal courts and an agreement that any dispute shall be resolved by arbitration; both appear to be clear indications that sovereign immunity has been waived." 658 P.2d at 760–61.

The cited case of *United States v. Oregon* referred to *Fontenelle v. Omaha Tribe of Nebraska*, 430 F.2d 143 (8th Cir. 1970) wherein the Eighth Circuit found that the adoption by the Omaha Tribe of a "sue and be sued" clause in its corporate charter amounted to an express waiver of sovereign immunity in regard to the quiet title action involved. In *United States v. Oregon*, supra, the Ninth Circuit Court of Appeals found that the tribe, in its contract with the state, had agreed that in the event problems arose that could not be solved by mutual agreement, the parties would submit the issues to federal court for determination. The Ninth Circuit ruled that "the Tribe may not at this stage renege on its earlier agreement." 657 F.2d at 1016.

■ We agree with the reasoning in *Native Village of Eyak*, supra. Before entering into the arbitration agreement, the respondent tribe was free from suit by petitioner. However, after agreeing that any dispute would be arbitrated and the result entered as a judgment in a court of competent jurisdiction, we find that there was an express waiver of the tribe's sovereign immunity. The tribe argues in its response to the petition for special action that while as an immune sovereign it could not have been sued without its consent, it has given its limited consent to be sued within the jurisdiction of the Pascua Yaqui Tribal Court. We do not agree. The arbitration agreement did not draw the distinction between the tribal court system and any other court system, but rather provided that any court of competent jurisdiction would suffice. Having expressly waived its sovereign immunity, civil jurisdiction would properly lie with the State of Arizona under 25 U.S.C. § 1300f(c) which applied 28 U.S.C. § 1360(a) to Pascua Yaqui Indian lands, notwithstanding the fact that the Pascua Yaqui tribal court may also have jurisdiction.

■ The tribe argues, and argued to the trial court, that even if the arbitration clause were deemed to be a waiver of the tribe's sovereign immunity, the entire contract including the clause is void, citing 25 U.S.C. § 81. That statute provides, in part:

"No agreement shall be made by any person with any tribe of Indians ... for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands ... unless such contract or agreement be executed and approved as follows:

\* \* \* \* \* \*

Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it."

The tribe argues that the agreement between the petitioner and the tribe was not approved or endorsed by the Secretary of the Interior and the Commissioner of Indian Affairs. The record before us is not clear. The signatories to the contract include a Mr. Samuel L. Hilliard, who, it appears, is a representative of the Department of the Interior's Bureau of Indian Affairs. The tribe's motion to dismiss the complaint below did not allude to the allegedly void character of the contract. This argument was raised only in the tribe's response to the petitioner's opposition to the motion. By inference, the trial court discounted the argument since it referred

to the arbitration clause in the contract as not constituting a legally sufficient waiver, thereby implying that the contract itself was to be considered valid. The problem here is that the tribe apparently waived this argument before the trial court and, indeed, before this court by arguing that the controversy over the agreement properly belongs before the tribal court, and not arguing that no agreement existed. On this state of the record we cannot consider this argument in order to deny relief from what we find to be an abuse of discretion by the trial court.

The order of the trial court dismissing petitioner's complaint is vacated and the cause is remanded to the trial court for further proceedings.

HOWARD and HATHAWAY, JJ., concur.