755 P.2d 421

Cheryl S. DIXON, a single woman,
Plaintiff/Appellee,

v.

PICOPA CONSTRUCTION COMPANY,
Defendant/Appellant,

Home Insurance Company,
Garnishee/Appellant.

No. 2 CA–CV 87–0164.

Court of Appeals of Arizona,
Division 2, Department A.

Nov. 30, 1987.

Petition for Review Granted
June 21, 1988.

OPINION

HATHAWAY, Judge.

This appeal was taken from the order of the trial court denying appellants' motions to set aside a default judgment and to quash a writ of garnishment issued on that judgment. Appellee Cheryl Dixon was injured on August 17, 1984, in Tempe, Arizona, when a gravel truck driven by Dinah Hill collided with an automobile driven by Dixon. Hill was allegedly acting within the course and scope of her employment with appellant Picopa Construction Company, a corporation chartered by the Salt River Pima-Maricopa Indian Community (community). At the time of the collision, Picopa was insured by a liability insurance policy issued by appellant Home Insurance Company.

On April 10, 1985, Dixon filed a complaint against Hill and Picopa. Dixon was unable to serve Hill, and Hill is not a party to this appeal. Although Dixon contacted Home Insurance, she was unable to personally contact anyone involved with Picopa. The Arizona Corporation Commission had no information about Picopa on file. The only address for Picopa that Dixon could secure was that given on the police accident report, which was the community's reservation address. The tribal police allegedly offered Dixon no assistance in her efforts to determine where and upon whom service of process might be made.

On November 26, 1985, Dixon attempted to serve Picopa by certified mail sent to "Picopa Construction Co., c/o Salt River Pima Indian Reservation, Scottsdale, Az." The letter was received at the community's financial office where the receptionist signed the return receipt. Dixon then notified Home Insurance that she had served Picopa. After the time to answer the complaint had expired, Dixon applied for a default judgment against Picopa for $100,000. One month later, the court issued a writ of garnishment directed toward Home Insurance. Picopa and Home Insurance then moved to set aside the default judgment and to quash the writ of garnishment on

Timothy J. Tweeton and Alicia Mykyta, Phoenix, for plaintiff/appellee.

Crampton, Woods, Broening & Oberg by William H. Doyle, Phoenix, for defendant/appellant.

Potts & Peterson by Richard G. Potts, Phoenix, for garnishee/appellant.

several grounds, including the claim that the sovereign immunity of the community extended to Picopa as a subordinate economic enterprise of the community. See *White Mountain Apache Indian Tribe v. Shelley*, 107 Ariz. 4, 480 P.2d 654 (1971); *S. Unique, Ltd. v. Gila River Pima–Maricopa Indian Community*, 138 Ariz. 378, 674 P.2d 1376 (App.1983). The trial court denied the motions. As to the sovereign immunity issue, the pertinent portions of the trial court's order are as follows:

> Although the defendant describes itself as a Salt River Pima Maricopa Indian Tribe, the defendant sued by the plaintiff is Pi–Copa Construction Co., a corporation chartered pursuant to an ordinance of the Salt River Pima Maricopa Indian Community and by admission of counsel for defendants the named insured under the policy issued by the Home Insurance Company.

> \*   \*   \*   \*   \*   \*

> The issue of service is decided above and that leaves the remaining issue as to whether Pi–Copa and Home are entitled to sovereign immunity based upon the alleged negligence of Pi–Copa causing injuries on the streets of Tempe, Arizona. As set forth above, the tribe is not a defendant in this action nor was it an insured under the policy insuring Pi–Copa. Pi–Copa was a separately chartered corporation with its own powers to act and specifically setting forth that there was no individual liability on the shareholder (the Tribe) or the directors or officers of the corporation.

> In this action, there is no attempt by the courts to exercise authority over an Indian Tribe and there is not in effect an indirect action against the tribe with an impermissible effect of allowing the successful party to reach tribal resources. The charter of Pi–Copa specifically precludes financial liability on the part of the tribe. Since the only parties who can be reached in this action are Pi–Copa and Home, there is no direct or indirect action against the tribe and the doctrine of immunity does not apply.

■ The law is well-settled that Indian tribes, as quasi-sovereign entities, are immune from suit. See, e.g., *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940); *Turner v. United States*, 248 U.S. 354, 39 S.Ct. 109, 63 L.Ed. 291 (1919). Without the consent of Congress, or of a tribe, an Indian tribe is exempt from suit. See *Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537 (10th Cir.1980). Indian tribes are immune from suit and such sovereign immunity is similar to the sovereign immunity of the United States; neither can be sued without consent of Congress. *People of the State of California ex rel. California Department of Fish and Game v. Quechan Tribe of Indians*, 595 F.2d 1153 (9th Cir.1979). Further, any waiver of immunity will not be implied, but must be unequivocally expressed. *Santa Clara Pueblo v. Martinez*, supra.

The issue of whether that immunity extends to other tribal entities has been litigated in a number of cases, principally in three contexts: cases involving tribal corporations chartered pursuant to 25 U.S.C. § 477 (§ 17 of the Indian Reorganization Act of 1934, "§ 17 corporations"), cases involving unincorporated tribal business enterprises, and cases involving tribal housing authorities established pursuant to tribal law.

1. *Section 17 Tribal Corporations*

25 U.S.C. § 477 provides:

The Secretary of the Interior may, upon petition by at least one-third of the adult Indians, issue a charter of incorporation to such tribe: *Provided,* That such charter shall not become operative until ratified at a special election by a majority vote of the adult Indians living on the reservation. Such charter may convey to the incorporated tribe the power to purchase, take by gift, or bequest, or otherwise, own, hold, manage, operate, and dispose of property of every description, real and personal, including the power to purchase restricted Indian lands and to issue in exchange therefor interests in

corporate property, and such further powers as may be incidental to the conduct of corporate business, not inconsistent with law, but no authority shall be granted to sell, mortgage, or lease for a period exceeding ten years any of the land included in the limits of the reservation. Any charter so issued shall not be revoked or surrendered except by Act of Congress.

Enacted at the same time was a provision conferring upon Indian tribes the right to adopt constitutions and bylaws for their governance. 25 U.S.C. § 476 (§ 16 of the Indian Reorganization Act). The purpose of these provisions was to encourage tribes "to revitalize their self-government through the adoption of constitutions and bylaws and through the creation of chartered corporations, with power to conduct the business and economic affairs of the tribe." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 151, 93 S.Ct. 1267, 1272, 36 L.Ed.2d 114, 121 (1973).

■ Tribal corporate charters issued pursuant to § 17 commonly include a "sue and be sued" clause, purporting to authorize actions against the corporation. The cases construing these provisions have consistently held that § 17 corporations are separate and distinct entities from the tribe and that the "sue and be sued" clauses constitute a waiver of immunity as to the corporation but not as to the tribe. See, e.g., *Ramey Construction Co. v. Apache Tribe of Mescalero Reservation*, 673 F.2d 315 (10th Cir.1982); *Parker Drilling Co. v. Metlakatla Indian Community*, 451 F.Supp. 1127 (D. Alaska 1978); *Atkinson v. Haldane*, 569 P.2d 151 (Alaska 1977). The policy behind such a construction was noted by the court in *Atkinson:*

> There is little doubt that the claims to sovereign immunity have been allowed in the courts in order to protect the limited and irreplaceable resources of the Indian tribes from large judgments. However, strict application of the immunity principle could severely retard the tribe's economic growth in a modern business world. Recognition of two legal entities, one with sovereign immunity, the other with the possibility for waiver of that immunity, would enable the tribes to make maximum use of their property. The property of the corporation would be at risk, presumably in an amount necessary to satisfy those with whom the tribe deals in economic spheres. Yet some of the tribal property could be kept in reserve, safe from a judgment execution which could destroy the tribe's livelihood, in recognition of the special status of the Indian Tribe. (Footnote omitted)

569 P.2d at 174–75.

■ Our research has revealed no cases involving a suit against a § 17 corporation whose charter did not include a "sue and be sued" clause; however, we believe that implicit in the decisions cited above is the assumption that the creation of the tribal corporation gives rise only to "the possibility for waiver," *id.*, and that absent the inclusion of such a clause in the corporate charter, the tribal corporation is immune from suit. See *Parker Drilling Co. v. Metlakatla Indian Community*, 451 F.Supp. at 1136, ("[T]he mere fact of corporate activity or existence does not waive the sovereign immunity enjoyed by the Community."); *S. Unique, Ltd. v. Gila River Pima–Maricopa Indian Community*, 138 Ariz. at 382, 674 P.2d at 1380. ("This section does not provide by its terms that any tribe incorporated pursuant to it can automatically be sued in a state court.")

## 2. *Subordinate Economic Enterprises*

■ The second line of cases has involved unincorporated enterprises created by a tribe to carry on one or more of its economic activities. A number of such cases have arisen in Arizona. See, e.g., *White Mountain Apache Indian Tribe v. Shelley*, supra; *S. Unique, Ltd. v. Gila River Pima–Maricopa Indian Community*, supra; *Graves v. White Mountain Apache Tribe of Fort Apache Indian Reservation*, 117 Ariz. 32, 570 P.2d 803 (App. 1977). In *Shelley*, the plaintiff brought a breach of contract action against the Fort Apache Timber Company (FATCO), and the defendants sought dismissal on grounds of sovereign immunity. The trial court ruled

that FATCO was a corporation by estoppel and/or a de facto corporation, and therefore a legal entity separate and distinct from the tribe and not protected by its immunity from suit. The Arizona Supreme Court reversed, finding that FATCO was a subordinate economic enterprise and part of the tribe, rather than a separate legal entity. Accordingly, FATCO was protected from suit by the tribe's sovereign immunity. Both *Graves* and *S. Unique* involved similar situations and the courts reached the same conclusion.

### 3. Tribal Housing Authorities

■ The third line of tribal entity immunity cases involves suits against housing authorities created by tribal ordinance. See, e.g., *Namekagon Development Co., Inc. v. Bois Forte Reservation Housing Authority*, 395 F.Supp. 23 (D.Minn.1974), aff'd, 517 F.2d 508 (8th Cir.1975); *Hickey v. Crow Creek Housing Authority*, 379 F.Supp. 1002 (C.D.S.D.1974); *Duluth Lumber and Plywood Co. v. Delta Development, Inc.*, 281 N.W.2d 377 (Minn.1979). The issue presented in each of those cases was the effect to be given to a "sue and be sued" clause or to a more express waiver of immunity in the ordinance creating the defendant entity. While the *Hickey* court, construing such language in conjunction with other tribal ordinances, concluded that the waiver pertained only to suits in tribal court, the other cases held that such clauses constituted a deliberate waiver by the tribe of whatever immunity to which the housing authority might otherwise be entitled. In the *Namekagon* case, the ordinance contained an express waiver, providing that the housing authority could "sue and be sued in its corporate name, upon any contract, claim or obligation arising out of its activities under this ordinance." 395 F.Supp. at 27. The district court analyzed the effect of this waiver as follows:

> Did the Reservation Business Committee [the governing body of the tribe], as distinguished from the Tribe, have power to create a legally responsible corporation? We think it did. It merely consented to waive the immunity of one corporation—a corporation fully funded by the

federal government to build a housing project on a reservation fully controlled by the Reservation Business Committee. The scope of the waiver was thus exceedingly narrow and could not obligate any of the Tribal assets. The Court believes that the power to grant such limited waiver was inherent in the Reservation Business Committee's power to establish a corporation.

*Id.* As in the cases involving § 17 corporations, implicit in the court's discussion is the presumption that, absent the express waiver, the housing authority would be immune from suit, notwithstanding the fact that it was created ostensibly as a corporation.

■ In the present case, although the community has adopted a tribal constitution pursuant to § 16 of the Indian Reorganization Act, it has not been issued a corporate charter pursuant to § 17 of that act. However, the community's governing body, the Community Council, is empowered by its constitution to "authorize, charter and regulate voluntary associations and corporations formed by members or by the community council of the Salt River Pima–Maricopa Indian Community for business or charitable purposes" and to "authorize formation of corporations under State or Federal law for economic, charitable or public purposes." Constitution and Bylaws of the Salt River Pima–Maricopa Indian Community, art. III, § 5(f).

Pursuant to article III, § 5(f) of its constitution, the community adopted Ordinance No. SRO–85–84 "[t]o Charter a corporation formed by the Community Council of the Salt River Pima–Maricopa Indian Community for business purposes." The ordinance is in essence the charter of the corporation and expressly confers broad powers on Picopa in addition to those powers otherwise conferred by ordinances of the community. The ordinance provides that "[t]he only stockholder of the corporation shall be the Salt River Pima–Maricopa Indian Community. All decisions authorized to be made by the stockholder [including the election of the directors of the corporation] shall be made by the Commu-

nity Council of the Salt River Pima–Maricopa Indian Community." Although the ordinance sets forth the maximum permissible indebtedness of the corporation, it also provides that the limitation may be exceeded if approved by "three-fourths (¾) of the votes cast with respect thereto at a lawfully held meeting of the stockholder of the corporation and approved by the Salt River Pima–Maricopa Indian Community." Two additional provisions relevant to this action are as follows:

> J. The stockholder, directors and officers of this corporation shall not be liable for the debts of the corporation, and the private property of the stockholders, directors and officers of this corporation shall now be forever exempt from its corporate debts.

> \* \* \* \* \* \*

> L. The President of the Salt River Pima–Maricopa Indian Community shall be the lawful agent for and on behalf of the corporation, to accept and acknowledge service of and upon whom may be served all necessary process or processes in any action, suit or proceedings that may be brought against said corporation in the Community Court of the Salt River Pima–Maricopa Indian Community.

With the exception of paragraph J quoted above, the charter as a whole establishes a relationship between Picopa and the community which is similar to that between FATCO and the White Mountain Apache Tribe in *Shelley* and *Graves,* and Gila River Farms and the Gila River Pima–Maricopa Indian Community in *S. Unique,* in that the entity was created by the community—as opposed to individual members thereof— pursuant to the tribal constitution, and the community as sole shareholder effectively controls Picopa's operations. In our view, the only significant difference lies in the community's creation of a corporate entity, which appellee argues is legally distinct from the community and therefore not protected by the community's immunity from suit.

■ While appellee's argument would have merit in a different context, it is clear that the issues in cases involving Indian tribes cannot be analyzed under commonly understood principles of corporate law and governmental immunity. Indian tribes, in their unique status as dependent sovereigns, are ultimately subject only to the plenary control of Congress, therefore, it is to the acts of Congress, its treaty relations with Indian tribes and whatever intent can be inferred therefrom that we must look in order to resolve this issue. See *Santa Clara Pueblo v. Martinez,* supra.

The supreme court and other courts have consistently held that tribes are immune from suit, that any waiver of immunity must be unequivocally expressed and will not be implied, and that any waiver of immunity must be interpreted liberally in favor of the tribe and restrictively against the claimant. See, e.g., *Santa Clara Pueblo v. Martinez,* supra, and cases cited therein; see also *Maryland Casualty Co. v. Citizens National Bank,* 361 F.2d 517 (5th Cir.), cert. den. sub nom. *Maryland Casualty Co. v. The Seminole Tribe of Florida, Inc.,* 385 U.S. 918, 87 S.Ct. 227, 17 L.Ed.2d 143 (1966); *S. Unique, Ltd. v. Gila River Pima–Maricopa Indian Community,* supra. Thus, while the creation of a corporation under state law would implicitly give rise to the right to bring suit against it, regardless of the presence of a "sue and be sued" clause in its charter of incorporation, creation of a tribal corporation under § 17 of the Indian Reorganization Act has been construed as merely creating the "possibility for waiver" of an immunity presumed to exist notwithstanding the adoption of the corporate form. *Atkinson v. Haldane,* supra. The same is true for tribal housing authorities, created as corporations under tribal law. *Namekagon,* supra. We are unable to find any basis for distinguishing those entities from the corporation in this case. Although the statement in subparagraph J. of the ordinance limits corporate liability, there is no statement expressly waiving sovereign immunity. We are constrained to hold that, absent an unequivocal waiver, Picopa enjoys the community's immunity from suit.

Turning again to the ordinance creating Picopa, we find no unequivocal waiver of

immunity. Paragraph J of the charter, quoted above, relieves the stockholder, directors and officers of any corporate liability, but does not address the issue of immunity from suit and cannot, in our view, be construed as an unequivocal waiver. Paragraph L, pertaining to service of process, obviously contemplates the possibility of suit, but even if it could be construed as a waiver of immunity it would only pertain to suits in tribal court. See *Hickey v. Crow Creek Housing Authority*, supra.

Our review of the case law reveals only three instances where a waiver of tribal immunity has been found in anything less than an express waiver or a "sue and be sued" clause. In *United States v. State of Oregon*, 657 F.2d 1009 (9th Cir.1981), the court held that the tribe's intervention in a lawsuit to establish and protect its fishing rights, and its agreement to submit issues to a federal court for determination constituted a waiver of immunity as a defense to a subsequent modification of the court's decree. In *Native Village of Eyak v. GC Contractors*, 658 P.2d 756 (Alaska 1983), and *Val/Del, Inc. v. Superior Court*, 145 Ariz. 558, 703 P.2d 502 (App.) cert. den. 474 U.S. 920, 106 S.Ct. 250, 88 L.Ed.2d 257 (1985), a contractual provision for arbitration of disputes was held to constitute a waiver of immunity. Neither is helpful in the present case.

In sum, we hold that Picopa, a corporation created under tribal law, is protected from suit in this case by the community's sovereign immunity. We further hold that nothing in the charter of the corporation or in the record as a whole would support a finding of waiver of that immunity. Accordingly, the trial court erred in refusing to grant appellants' motions to set aside the default judgment and to quash the writ of garnishment issued upon the judgment.

Our decision does not leave appellee without a remedy inasmuch as she could proceed against the driver of the gravel truck by serving the superintendent of motor vehicles pursuant to A.R.S. §§ 28–502 and 28–503.

HOWARD, P.J., concurs.

LACAGNINA, Chief Judge, dissenting.

I dissent from the majority opinion because I find that the State of Arizona had jurisdiction, and that service of process was valid. I would affirm the trial court's refusal to set aside the default judgment. The rule of sovereign immunity does not apply, nor should it be extended to govern the facts of this case. If sovereign immunity does apply, the tribal corporation waived its immunity and consented to be sued by operating its gravel truck off of the reservation within the jurisdiction of the State of Arizona while covered by sufficient insurance to compensate the injuries caused by its conduct.

The majority opinion leads to an unjust result, and the authorities relied on as support for the opinion are governed by factual situations falling within the following general categories, none of which apply to the facts of the present case:

1. Events occurring on an Indian reservation.

2. Events resulting from contracts with Indians and their communities exclusively covered by the United States Constitution and Congressional acts governing trade with Indians.

3. Events within the exclusive jurisdiction of Indian tribes because of their right to self-government over tribal members and tribal territories.

4. State action in attempting to extend state jurisdiction onto an Indian reservation to govern and control conduct of the tribe and its members for acts occurring on the reservation. See, e.g., *Santa Clara Pueblo v. Martinez* (suit brought by an Indian against the tribe under the Indian Civil Rights Act, 25 U.S.C.A. 1301, *et seq.*); *Ramey Construction Co. v. Apache Tribe of Mescalero Reservation* (civil rights action by construction company against tribe under contract with tribe to construct a hotel complex on the reservation); *Atkinson v. Haldane* (suit against tribe under civil rights act for wrongful death occurring on the reservation); and *Merrion v. Jicarilla Apache Tribe* (suit by non-Indian

lessees against tribe seeking injunction on enforcement of tribe's oil and gas severance tax for oil produced on reservation land).

The use of tribal "sovereign immunity" to deprive a citizen of Arizona from recovering damages for personal injuries inflicted by an Indian corporation in an automobile-truck accident occurring off the reservation in a metropolitan city is a travesty of justice. There is nothing in the United States Constitution, acts of Congress, or federal court decisions which purports to create and extend "Indian sovereign immunity" over the citizens of Arizona to prevent liability for personal injuries inflicted on a citizen of Arizona by an Indian corporation operating a gravel truck in a commercial venture off the reservation.

To begin with, the concept or rule of sovereign immunity from torts was abolished in *Stone v. Arizona Highway Commission*, 93 Ariz. 384, 381 P.2d 107 (1963), in a well-reasoned opinion based upon the premise that when the reasons for a rule no longer exist, the rule should be abandoned. The court said:

Sovereign or governmental immunity began with the personal prerogatives of the King of England upon the theory that "the King can do no wrong," and even though at a very early date in American history we overthrew the reign of the English King the doctrine somehow became entrenched in our judicial code. Professor Borchard has termed this phenomenon as "one of the mysteries of legal evolution." Borchard, Governmental Liability in Tort, 34 Yale L.J. 1, 4. Its survival for such a great period of time in this country, where the royal prerogative is unknown, has perhaps been even more remarkable, considering it has been universally criticized as an anachronism without rational basis. Most writers and cases considering this fact have claimed that its only basis of survival has been on grounds of antiquity and inertia.

\* \* \* \* \* \*

It has been urged by the adherents of the sovereign immunity rule that the principle has become so firmly fixed that any change must come from the legislature. In previous decisions (the latest being Lee v. Dunklee, supra) this court concurred in this reasoning. Upon reconsideration we realize that the doctrine of sovereign immunity was originally judicially created. We are now convinced that a court-made rule, when unjust or outmoded, does not necessarily become with age invulnerable to judicial attack. This doctrine having been engrafted upon Arizona law by judicial enunciation may properly be changed or abrogated by the same process.

*Id.* at 388, 393, 381 P.2d at 109, 113 (footnotes omitted).

In the absence of federal legislation giving Indians and Indian tribes or their corporations immunity from liability for injuries to citizens of Arizona beyond the boundaries of their territorial lands, *Stone* is the applicable law in this case. A tribal corporation doing business and operating a gravel truck off the reservation is not entitled to claim "Indian sovereign immunity." As indicated from the accident report, the driver was cited in this case for maintaining a speed not reasonable and prudent. Three witnesses to the accident gave signed written statements and agreed that the driver of the truck did not slow down prior to the collision with the rear end of Dixon's car.

There is no federal legislation or constitutional authority which would allow Indians to violate the motor vehicle statutes while driving on state highways. Picopa does not argue the driver in this case was immune from the state's exercise of jurisdiction for violation of its motor vehicle statutes. As the supreme court stated in *Smith Plumbing Co. v. Aetna Casualty and Surety*, 149 Ariz. 524, 530, 720 P.2d 499, 505 (1986), "[a]s the activity in question moves off the reservation, the State's governmental and regulatory interest increases dramatically and federal protectiveness of Indian sovereignty lessens," *citing, Organized Village of Kake v. Egan*, 369 U.S. 60, 75, 82 S.Ct. 562, 571, 7 L.Ed.2d 573 (1962). *Compare Wauneka v. Campbell*, 22 Ariz.App. 287, 526 P.2d 1085 (1974) (state lacks jurisdiction to enforce Arizona

Motor Vehicle Safety Responsibility Act on the reservation). *See also Enriquez v. Superior Court*, 115 Ariz. 342, 565 P.2d 522 (App.1977) (action brought by non-Indian plaintiff for injuries occurring in automobile accident on reservation with Indian defendant). In both *Wauneka* and *Enriquez* the court ruled that the state action infringed on the right of reservation Indians to make their own laws and be ruled by them in Indian country. Off the reservation, this analysis fails.

In the event the above analysis is insufficient, then I believe the tribe has consented to be sued or has waived its immunity in this case. If one considers the tribal corporation to be a nonresident of this state because it was created by the tribe under tribal laws, then its operation of a gravel truck in Arizona off the reservation subjects it to A.R.S. §§ 28–502(A)(2) and (A)(3) and 28–502(B), which, at the time of Dixon's injury, provided as follows:

§ 28–502. Appointment by nonresident of attorney upon whom to serve process

A. The rights and privileges conferred by § 28–501 and paragraphs 3, 4 and 5 of § 28–412, shall be deemed accepted, and such acceptance evidenced, by a nonresident:

\* \* \* \* \* \*

2. When the nonresident, by himself or his agent, operates a motor vehicle on a public highway in this state otherwise than under the provisions of such section.

3. When a motor vehicle owned by a nonresident is operated on a public highway in this state with his express or implied permission under such circumstances as would render a resident motor vehicle owner liable for damages to person or property caused by such operation.

B. The acceptance of the rights and privileges set forth in subsection A of this section shall be deemed to constitute and be the appointment of the vehicle superintendant by the nonresident as his true and lawful attorney upon whom may be served all legal process in an action against such nonresident growing out of any accident or collision in which the nonresident, his agent or other person operating a motor vehicle owned by him with his express or implied permission on a public highway in this state is involved.

I would hold that this statute applies to Picopa and the Community and is a form of consent to be sued under the facts of this case. Although process was not served as permitted by A.R.S. § 28–503 and under Rule 4(e)(5), Ariz.R.Civ.P., 16 A.R.S., by service upon the superintendent of motor vehicles, sufficient and lawful process was obtained pursuant to Rule 4(e)(1) and (6). Service of process permitted by § 28–503 and Rule 4(e)(5) does not preclude or invalidate service by other lawful means.

In the present case, Dixon attempted personal service of the summons and complaint on the reservation by Indian officers authorized to deliver the summons and complaint as contemplated and approved in *Francisco v. State*, 113 Ariz. 427, 556 P.2d 1 (1976), but her attempts were frustrated by refusal of the Indian officers to assist in the service of process. This conduct gave Dixon the right to use registered mail, an alternate method of service as provided by Rules 4(e)(2)(a) and 4(e)(6)(a)(IV).

This reasoning does not project Arizona law onto the reservation nor does it allow an unauthorized process server the right to exercise authority on the reservation, nor does it interfere with tribal sovereignty over tribal members or tribal lands. In keeping with the decision in *Francisco*, I reason the United States mail carrier does not receive his authority to deliver mail on the reservation from the State of Arizona and is not an officer of the State of Arizona. The tribe does not argue that the mail carrier was unauthorized to deliver mail on the reservation or that he exceeded his authority by delivering registered mail in this case. There is nothing in the record to indicate the tribe has not consented to receive United States mail on the reservation. The mail carrier, not acting under any power vested in him by the State of Arizona, *is not serving process, but is only delivering mail.* The process in this case was not

complete and did not occur until Dixon filed the proper affidavit showing delivery and receipt of the mail by the tribe, which event occurred in the clerk's office in Maricopa County, off the reservation.

In this case, I find no United States treaty or act of Congress prohibiting exercise of state jurisdiction based on proper alternate service of process by registered mail where the tribal corporation caused injuries off the reservation. The responsibility for the injuries suffered by Dixon has nothing to do with any perceived state interference with the exercise of tribal sovereignty over its members or lands. *See Kadota v. Hosogai,* 125 Ariz. 131, 608 P.2d 68 (App.1980).

To those who would argue that tribal sovereign immunity should be recognized to cover the facts of this case because Indian lands and assets should be protected from alienation and depletion and should be immune from execution, subject only to restraints stated in acts of Congress, I find compelling the fact that in this case the Community is protected by an insurance policy in an amount which far exceeds the amount of Dixon's judgment.

I find inapplicable the decision in *S. Unique, Ltd. v. Gila River Pima–Maricopa Indian Community,* 138 Ariz. 378, 674 P.2d 1376 (App.1984), because it arose out of contract, the delivery and use of the chemical was on the reservation, and service of process was found insufficient.

In addition, the court of appeals decision in *Graves v. White Mountain Apache Tribe,* 117 Ariz. 32, 570 P.2d 803 (App. 1977), is not controlling in this case because that involved a non-Indian employee working for an Indian tribe on Indian land where the tribe itself had liability insurance to protect against negligent acts of the tribe, its agents and its employees.

Nothing proposed in this dissent would interfere with the supremacy of federal law as it pertains to the Indian communities, the use of their lands, trade with non-Indians, or their right to self-government. What I propose is to permit a citizen of Arizona the right to recover damages for personal injuries suffered in Arizona by reason of the negligent operation of a truck by an Indian corporation off the reservation, which damages are covered by the proceeds of an insurance policy.