772 P.2d 1104

**Cheryl S. DIXON, a single woman,
Plaintiff/Appellee,**

**v.**

**PICOPA CONSTRUCTION COMPANY,
Defendant/Appellant,**

**Home Insurance Company,
Garnishee/Appellant.**

**No. CV–88–0049–PR.**

Supreme Court of Arizona.

Jan. 24, 1989.

Law Firm of Timothy J. Tweeton by Timothy J. Tweeton, Phoenix, for plaintiff/appellee.

Crampton, Woods, Broening & Oberg by Neal B. Thomas, Phoenix, for defendant/appellant Picopa Const. Co.

Potts & Peterson by Richard G. Potts, Phoenix, for garnishee/appellant Home Ins. Co.

Shea & Wilks by Richard B. Wilks, Phoenix, for amicus curiae Salt River Pima–Maricopa Indian Community.

FELDMAN, Vice Chief Justice.

Plaintiff, Cheryl Dixon, petitions this court to review a decision of the court of appeals, 157 Ariz. 116, 755 P.2d 421. She argues that the court erred in recognizing the sovereign immunity defense asserted by the insurer of Picopa Construction Co. (Picopa), a corporation formed under the laws of the Salt River Pima–Maricopa Indian Community, an Indian tribe. The tribe is Picopa's sole stockholder. We granted review because the case presents important issues of first impression. *See* Rule 23(c)(4), Ariz.R.Civ.App.P., 17B A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), A.R.S. § 12–120.24, and Rule 23, Ariz.R.Civ.App.P., 17B A.R.S.

In deciding the sovereign immunity issue, we necessarily examine the breadth of the "subordinate economic organization" doctrine first recognized by this court in *White Mountain Apache Indian Tribe v. Shelley*, 107 Ariz. 4, 480 P.2d 654 (1971). We conclude that Picopa is not a subordinate economic organization within the meaning of *White Mountain Apache* and, hence, not entitled to raise the tribe's immunity defense. Thus, we must also consider the reach of Rule 4, Ariz.R.Civ.P., 16 A.R.S.,[1] in securing effective service of process against Picopa.

## I. FACTS AND PROCEDURAL HISTORY

On August 17, 1984, Cheryl Dixon was the driver of an automobile waiting to make a right turn while stopped at an intersection in Tempe, Arizona. At the intersection, a dump truck, owned by Picopa and operated by its employee, Dinah Hill, rear-ended Dixon's car causing property damage and physical injury to Dixon and her passenger. The accident occurred off-reservation; Dixon is not a tribal member.

Dixon and her passenger retained the same counsel soon after the accident. On August 29, 1984, counsel wrote Picopa's insurer, Home Insurance Co. (Home), and offered to begin settlement negotiations. Home acknowledged counsel's letter by its own letter dated September 14, 1984. Negotiations between Dixon's passenger and Home reached fruition relatively quickly; they settled the case within five months of the accident. Dixon's injuries, on the other hand, were more serious and a settlement was not as easily forthcoming. On April 10, 1985, with negotiations continuing, Dixon's attorney filed a damage action in superior court, naming Picopa and the truck

1. The Arizona Rules of Civil Procedure are here- after cited as "Rule ___."

driver as parties. We note that the complaint did not name the Salt River Pima–Maricopa Indian Community (the Community) as a defendant. Rather than serving the complaint and summons, Dixon's counsel sent a demand letter informing Home that a complaint had been filed against Picopa but not yet served. Deposition of Florence Lynch, filed June 30, 1988, at 15. During a telephone call on October 11, 1985, Dixon's attorney also told a Home supervisor that he had filed the complaint. *Id.* at 12–13.

When negotiations failed to reach a satisfactory result, Dixon's attorney attempted to serve the complaint and summons. The only address listed on the police accident report for Picopa Construction Co. was the "Salt River Pima Indian Reservation, Scottsdale, Arizona." Inquiries with the Arizona Corporation Commission revealed that the Commission had no records on Picopa and, thus, no listed statutory agent for service of process.[2] A private process server's attempts to secure a better address for Picopa from a Community police officer met with similar failure. Attempts to enlist Home's aid in securing service on Picopa were fruitless. *See* Deposition of Florence Lynch, *supra*, at 20–23. Despite these efforts, the only address discoverable for Picopa was the address for the Community.

Consequently, on November 25, 1985, Dixon's counsel sent copies of the summons and complaint by certified mail, return receipt requested, to Picopa at the Community's reservation office. On November 26, 1985, Cecilia Nash received and signed for the certified mail. Nash was a receptionist at the Community's finance office and was the sole recipient of all mail, certified and otherwise, addressed to the Community.[3] Neither Picopa nor Home responded to the complaint and summons. On March 25, 1986, Dixon filed an application for entry of default.[4] The record discloses that at least by April 4, 1986, Home had notice that Dixon had attempted service of the complaint and summons by certified mail and that the default proceedings were imminent. The court entered the default judgment against Picopa after a hearing held on April 25, 1986. Neither Home nor Picopa appeared at the default hearing.

On May 13, 1986, at Home's request, Dixon's counsel sent Home copies of the complaint, summons, and default judgment.[5] Dixon filed a garnishment application against Home on May 30, 1986. Home made its first appearance in court by filing a motion to set aside the default judgment on June 5, 1986, and a motion to quash the writ of garnishment on June 9, 1986. Picopa and Home then filed a notice of appeal from the default judgment entered against Picopa, the trial court's denial of the motion to set aside the default, and from the judgment entered against Home on the return of the writ of garnishment.

## II. DECISIONS BELOW

Home and Picopa argued below and here that the Community's tribal immunity insulates Picopa from suit in Arizona courts without the Community's consent or the consent of the United States Congress. They also argued that service of process on Picopa was defective because it did not

---

**2.** A.R.S. §§ 10–110(A)(5) and 10–115 provide that any foreign corporation, *i.e.*, one not incorporated under Arizona law, must list a statutory agent for service of process in its application to do business in this state.

**3.** In her affidavit Nash denied that she had any authority to accept service of legal process on behalf of the Community, its officers, or Picopa.

**4.** Dixon sent copies of the default application to Picopa by certified mail to the same address as the complaint and summons. The postal service returned these mailings to Dixon's counsel as undeliverable.

**5.** Florence Lynch, a Home employee, swore in an affidavit that it was normal and customary for Home to request copies of complaints when Home had knowledge that a complaint had been *filed* and not just after service. Affidavit of Florence Lynch, Record on Appeal at 9(h). Yet at her deposition, Lynch could not remember requesting a copy of the complaint. Deposition of Florence Lynch, *supra*, at 30. Thus, any delay by Dixon's counsel in sending a copy of the complaint to a known insurer seems to have been compounded by Home's failure to follow their own policy and request a copy when they had notice of the filing on September 13, 1985.

comply with Rule 4, and if in compliance, service was nonetheless ineffective because our service of process laws have no force or effect within the boundaries of an Indian reservation.

The trial court found that (1) Picopa was not entitled to immunity because Picopa was not part of the Community, and (2) Picopa and Home received the best possible notice under the circumstances. It therefore denied Picopa's motions to set aside the default and quash the writ of garnishment. In a 2–1 decision, the court of appeals disagreed. *Dixon v. Picopa Construction Co.*, 157 Ariz. 116, 755 P.2d 421 (Ct.App.1987). The court noted that Indian tribes, as quasi-sovereigns, are immune from non-consensual suit, and that any waiver of their immunity must be "unequivocally expressed." *Id.* at 118, 755 P.2d at 423. The court concluded that Picopa was a subordinate economic organization within the meaning of *White Mountain Apache*, and *S. Unique, Ltd. v. Gila River Pima–Maricopa Indian Community*, 138 Ariz. 378, 674 P.2d 1376 (Ct.App. 1983), *rev. denied* (1984). *Dixon*, 157 Ariz. at 121, 755 P.2d at 426. Therefore, Picopa was a beneficiary of the Community's immunity. *Id.* at 119, 121, 755 P.2d at 424, 426. The court's majority opinion rejected the argument that Picopa waived its immunity either by its act of incorporation, or by the presence of a clause in its charter relieving the stockholder, directors, and officers from any corporate liability. *Id.* at 121–22, 755 P.2d at 426–27. Thus, we must decide whether Picopa is the Community's subordinate economic organization within the meaning of Arizona law, whether Picopa is otherwise entitled to assert the Community's tribal immunity, and, if not, whether process was properly served.

## III. DISCUSSION

We begin this analysis by noting that the Community never was a party to this litigation. Dixon filed suit only against Picopa and the driver of the truck that collided with her. Because Dixon could not serve the driver, the driver was not a party to the appeal or the petition for review. *Dixon*, 157 Ariz. at 117, 755 P.2d at 422.

### A. Tribal Immunity

#### 1. *The Picopa Charter*

Before we can apply legal principles, we must first examine Picopa's relationship with the Indian Community. The Community incorporated Picopa pursuant to art. III, § 5(f) of the Community's constitution. Community Ordinance No. SRO–85–84 establishes Picopa's existence as a corporation under Community law and also functions as Picopa's corporate charter. It defines Picopa as an organization established for general business purposes and confers it with very broad corporate powers.[6] The charter establishes the Community as the corporation's sole stockholder. A clause exempts the stockholder, officers, and directors from any liability for corporate debts.

The charter creates a board of directors to control the corporation's operations. This board, like any other board of directors, is elected annually by the stockholder. Each board member serves until his successor is elected and qualified. The charter has no director removal provision. The board has the usual broad general powers over the corporation. For example, the board elects the corporate officers, determines the terms of stock subscriptions, has discretion to issue new classes of stock, and has authority to establish a pension

---

6. SRO–85–84, in effect at the time of the collision, provides in pertinent part:

C. The nature of the business and the objects and purposes to be transacted, promoted and carried on are to do any or all of the things herein mentioned, as fully and to the same extent as natural persons might or could do, to wit:

I. To act as a general contractor for the construction, repairing and remodeling of buildings and public works of *all kinds,* and for the improvement of real estate, and the doing of *any and all other business* and contracting incidental thereto, or connected therewith, and the doing and performing of any and all acts or things necessary, proper, or convenient for or incidental to the furtherance or the carrying out of the powers or purposes herein mentioned.

(Emphasis added.)

plan and invest it as the board deems best. The charter does not require that either board members or corporate officers be selected from among Community officers or even members. Picopa also holds title to any acquired property in its own name and not in the Community's. The only express limitation the ordinance places on the board's discretion is on the board's ability to exceed the ordinance's corporate debt ceiling. Thus, the corporate board of directors, and not the Community Council, controls Picopa.

### 2. *Subordinate Economic Organization*

We recognized the subordinate economic organization doctrine in *White Mountain Apache.* There, we held that the Fort Apache Timber Co. (FATCO) was a subordinate economic organization and actually a part of the tribe *per se,* and, thus, clothed with tribal immunity. 107 Ariz. at 7, 480 P.2d at 657. We pointed out that the tribe's constitution gave it the authority to create " 'subordinate organizations for economic and other purposes,' " *id.* at 5, 480 P.2d at 655 (quoting Amended Constitution and By-laws of the White Mountain Apache Tribe of the Fort Apache Indian Reservation Arizona (1958)), and that it was apparent that FATCO was such an organization directly subordinate to the tribal government. *Id.* at 5–6, 480 P.2d at 655–56. FATCO's corporate charter, the "Plan of Operation," supported this conclusion by revealing the multitude of ways the tribal government was intimately involved in FATCO's daily operations. For example, the tribal council *qua* council directly selected FATCO's board members; the coun-

cil could suspend board members for cause; the board acted "for and on behalf of the tribe"; FATCO made all of its purchases through the tribe; and FATCO held title to all property, with limited exceptions, in the tribe's name. *Id.* at 6, 480 P.2d at 656. Thus, in *White Mountain Apache,* there was abundant evidence that FATCO was merely an extension of the tribal government—a method of doing the tribe's economic business.[7]

Subsequently, in *S. Unique,* our court of appeals addressed the issue of Indian subordinate economic organizations. In that case, the plaintiff filed an action against Gila River Farms (GRF), an unincorporated entity, and the Gila River Pima–Maricopa Indian Community, a corporation established pursuant to 25 U.S.C. § 477.[8] The court held that if it found GRF to be a subordinate economic organization of the Indian government, rather than an instrumentality of the Indian corporation, GRF was beyond the superior court's jurisdictional reach. 138 Ariz. at 380, 674 P.2d at 1378. Finding that GRF was a subordinate economic organization of the community government, the court held that GRF could rightfully assert the immunity defense. *Id.* at 381, 674 P.2d at 1379. The court relied on the following facts in determining that GRF was the community's subordinate economic organization: GRF was managed by a "Farm Board," which functioned " 'as an extension of the [Community] Council' "; the Farm Board was a " 'technical advisory board' " that represented the Indian community; the Farm Board performed duties and obligations " 'as delegated by the [Community] Council' "; GRF's plan of operation provided that any of GRF's finan-

---

7. Of course, Picopa might argue that because the Community was Picopa's sole stockholder, it received all of the benefits from Picopa's existence. Therefore, the tribe *qua* tribe would reap the benefits of Picopa's commercial enterprises. We reject this concept. Its inevitable consequence would be to confer tribal immunity on every entity established by an Indian tribe, no matter what its purposes or activities might have been.

8. Federal law permits an Indian tribe to segregate itself into two distinct entities—a tribal government and an Indian corporation estab-

lished for business and commercial purposes. 25 U.S.C. § 476 (tribal government), § 477 (Indian corporation). The tribal government retains its traditional tribal immunity unless expressly waived while the Indian corporate charter usually, though not automatically, includes a sue-or-be-sued clause. *S. Unique,* 138 Ariz. at 383–84, 674 P.2d at 1381–82 (citing *Atkinson v. Haldane,* 569 P.2d 151, 174–75 (Alaska 1977) (discussing separateness of tribal government and tribal corporation)); *see also* F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW 326 (1982).

cial arrangements must be made satisfactorily to the community council; GRF's records and files were community property; and GRF held property in the community's name. *Id.* (quoting GRF Plan of Operation). The court found that GRF's Plan of Operation was similar to FATCO's and, accordingly, followed *White Mountain Apache* by holding that GRF was a subordinate economic organization. *Id.*

■ In short, the subordinate economic organization doctrine allows Indian *tribes* to conduct their economic affairs through subordinate governmental agencies without fear of an unintended waiver of immunity. Although this court does not favor bestowing immunities from tort liability for negligence on preferred classes of defendants, *Ontiveros v. Borak,* 136 Ariz. 500, 512, 667 P.2d 200, 212 (1983); *see Stone v. Arizona Highway Commission,* 93 Ariz. 384, 381 P.2d 107 (1963), substantial policy considerations militate in favor of recognizing immunity when a tribe conducts tribal business through a tribal economic entity. However, the doctrine was never meant to protect entities conducting non-tribal business. We do not, at this time, attempt to define "tribal business" or distinguish it from "non-tribal business." Suffice it to say that for all this record shows, Picopa's off-reservation activities at the time of the accident were independent of any activity connected with tribal self-government or the promotion of tribal interests.

The court of appeals relied on *White Mountain Apache, S. Unique,* and *Graves v. White Mountain Apache Tribe of Fort Apache Indian Reservation,* 117 Ariz. 32, 570 P.2d 803 (Ct.App.1977), *cert. denied,* 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978).[9] It found the Picopa charter too similar to those in the cited cases and believed itself "constrained to hold that ... Picopa enjoys the community's immunity from suit." *Dixon,* 157 Ariz. at 121, 755 P.2d at 426. The court of appeals reasoned that the only appreciable difference between the Picopa ordinance and the

FATCO/GRF plans of operation was that Picopa was incorporated. *Id.* Furthermore, in consideration of the "unique status" of Indian tribes as "dependent sovereigns," the court would not apply the usual rules of corporate law and presume a corporate waiver of immunity from suit. *Id.* We believe the court of appeals incorrectly applied the rule of subordinate economic organizations.

**3.** *Picopa is not a Subordinate Economic Organization*

■ We disagree with the court of appeals' view that Picopa's corporate status is the only appreciable difference between Picopa and the subordinate economic organizations found in *White Mountain Apache* and *S. Unique.* We further disagree with the court's belief that the fact of incorporation makes little difference in determining whether an Indian commercial enterprise is a subordinate economic organization. We address these issues in turn.

**a.** Picopa's Independence from the Community

Besides the corporate status, significant differences exist between Picopa and FATCO/GRF. Picopa has a board of directors, *separate from the tribal government,* which exercises full managerial control over the corporation. Thus, unlike FATCO and GRF, the tribal government does not manage the corporation. *See Smith Plumbing Co., Inc. v. Aetna Casualty & Surety Co.,* 149 Ariz. 524, 533 n. 1, 720 P.2d 499, 508 n. 1 (Feldman, J., dissenting) (recognizing distinction between commercial entities that are part of tribal government and those that are not).

Further, the purchase of general liability insurance covering Picopa's negligence and the limited liability clause found in Picopa's charter insulate the Community's assets from Picopa's debts. This counsels against a finding that Picopa is a subordinate economic organization. Although we have held that the presence of liability insurance

**9.** *Graves* is a case similar to *White Mountain Apache* involving FATCO and distinguishable from *White Mountain Apache* only by the presence of FATCO's liability insurance policy. *Graves,* 117 Ariz. at 33–34, 570 P.2d at 804–05.

is irrelevant to determining whether a *tribe* has waived its immunity, *Graves*, 117 Ariz. at 34, 570 P.2d at 805, we believe the presence of liability insurance is relevant to the question of whether an Indian *commercial entity* is a subordinate economic organization under *White Mountain Apache.* The purchase of liability insurance is some evidence that the Community expected its corporation to be liable for its torts.[10] We also believe that the ordinance's express declaration that the Community formed Picopa solely for business purposes and without any declared objective of promoting the Community's general tribal or economic development further evidences Picopa's independence from the Community. This is an additional factor weighing against a finding that Picopa is a subordinate economic organization.[11] *Cf. White Mountain Apache*, 107 Ariz. at 6, 480 P.2d at 656 (plan of operation contained express decla-

ration of tribe's general economic development as purpose of commercial entity), *and S. Unique*, 138 Ariz. at 381, 674 P.2d at 1379 (same).

### b. Picopa's Functions

Most importantly, unlike FATCO and GRF, Picopa was not formed to aid the Community in carrying out tribal governmental functions.[12] So far as its articles or any extrinsic evidence show, Picopa was simply a for-profit corporation involved in construction projects. The present record offers no evidence that Picopa had limited itself to tribal projects.[13] Nor does the record even establish the nature of the business being carried out when the off-reservation accident occurred. We are unwilling to speculate or assume on a silent record whether Picopa, or any other non-tribal entity, can assert the Community's immunity.

10. The Community seems to share this belief. On June 21, 1988, we granted Dixon's Motion for Procedural Order, which allowed Dixon to supplement her Petition for Review. The supplement to the record consists of a Motion to Intervene in the Appeal by Real Party in Interest in Order to Petition for Review, which the Community submitted to the court of appeals on December 22, 1987. The motion to intervene states the Community's position in the following terms:

If the ... Community had been a participant in this action, it would not have raised the defense of sovereign immunity since under the facts of this case that defense would not have benefited it and would have in fact frustrated its interest in protecting persons who had been injured as a result of negligence of its employees. That interest is expressed in the purchase by the ... Community of insurance for such purposes from the Home Insurance Company. It is not the policy of the ... Community to expend money for the purchase of insurance and subsequently exercise its sovereign immunity to frustrate the purposes for which insurance was purchased.
Motion to Intervene, at 3–4.

The Community's latest position differs somewhat from that expressed in the motion to intervene. The Community, before this court as *amicus curiae*, now asserts that Picopa is entitled to assert the Community's immunity, and that we should refer any waiver issue to the Community. Brief of *Amicus Curiae* at 2–3. We do not take cognizance of the Community's argument on this point. *Amici* are allowed to appear and present arguments for or against an issue raised by one of the parties to the litiga-

tion. They are not allowed to appear and present new issues, not raised by the parties in either the trial court or the court of appeals.

11. Establishment of a mere commercial enterprise may not be relevant to a *tribal* immunity waiver analysis, *Morgan v. Colorado River Indian Tribe*, 103 Ariz. 425, 428, 443 P.2d 421, 424 (1968), but we believe it is relevant to the subordinate economic organization analysis.

12. FATCO was the tribal agency through which the White Mountain Apache Tribal Council exercised its tribal constitutional power to manage the tribe's timber resources. *White Mountain Apache*, 107 Ariz. at 5–6, 480 P.2d at 655–56. GRF was an on-reservation commercial farm through which the Gila River Pima–Maricopa Indian Community exploited its agricultural resources. *S. Unique*, 138 Ariz. at 379, 381, 674 P.2d at 1377, 1379.

13. Indeed, even if Picopa, as a corporate non-subordinate economic organization, had limited itself exclusively to on-reservation projects, it still may have been subject to Arizona's jurisdiction for this off-reservation tort. *See Namekagon Development Co. v. Bois Forte Reservation Housing Authority*, 395 F.Supp. 23, 26–27 (D.Minn.1974) (waiver of tribal immunity by Indian corporation organized under tribal law and dedicated exclusively to on-reservation activity may be implied from circumstances surrounding incorporation) (dicta) (citing *Keifer & Keifer v. Reconstruction Finance Corp.*, 306 U.S. 381, 388–89, 59 S.Ct. 516, 517, 83 L.Ed. 784 (1939)), *judgment aff'd*, 517 F.2d 508 (8th Cir. 1975).

### c. Picopa's Incorporation

We further believe that Picopa's status as a corporation also weighs heavily against a finding that Picopa is a subordinate economic organization. In *White Mountain Apache*, we stated:

> In the court below respondent judge also ruled that FATCO was a de facto corporation [and therefore not immune from suit]. In order for a de facto corporation to exist there must be "(1) a valid law under which a corporation with the powers assumed might be incorporated; (2) a bona fide attempt to organize a corporation under such law; and (3) an actual exercise of corporate powers." 18 Am.Jur.2d, Corporations § 51, p. 595. In the instant case there is no allegation nor is there any evidence that there was any attempt to incorporate FATCO; therefore, there is no basis for the finding that FATCO is a de facto corporation.

107 Ariz. at 7, 480 P.2d at 657. Thus, we alluded to the materiality of corporate status in our subordinate economic organization analysis. We cannot agree with the court of appeals' opinion that Picopa's incorporation is insignificant in determining the outcome of this case. *See Namekagon Development Co. v. Bois Forte Reservation Housing Authority*, 395 F.Supp. 23, 26–27 (D.Minn.1974) (analogizing Indian corporations to corporations created by the United States government and suggesting in dicta that corporate status implies a waiver of immunity), *judgment aff'd*, 517 F.2d 508 (8th Cir.1975).

Tribal sovereign immunity does not apply to individual Indians, but only to Indian tribes and their subordinate economic organizations. *Puyallup Tribe, Inc. v. Department of Game*, 433 U.S. 165, 172, 97 S.Ct. 2616, 2621, 53 L.Ed.2d 667 (1977) (immunity not extended to individual Indians); *United States v. United States Fidelity & Guaranty Co.*, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940) (recognition of tribal immunity); *White Mountain Apache* (immunity of subordinate economic organizations). Here the Community created an artificial individual, a corporation, and charged it with all the power to act "to the same extent as natural persons might or could do...." SRO–85–84 ¶ C. No extrinsic evidence shows that this corporation was intended to act or did act as an extension of tribal government. This artificial individual is not, therefore, a subordinate economic organization and is not entitled to assert the tribal immunity defense. *See Puyallup*, 433 U.S. at 172, 97 S.Ct. at 2621.

### 4. *Policies Underlying the Immunity Doctrine*

Further, an examination of the federal policies underlying the immunity doctrine convinces us that we should not grant immunity here. Tribal immunity should only apply when doing so furthers the federal policies behind the immunity doctrine. Note, *Tribal Sovereign Immunity: Searching for Sensible Limits*, 88 COLUM.L.REV. 173, 183, 186 (1988). Several of those federal policies are implicated here: Protection of tribal assets, preservation of tribal cultural autonomy, preservation of tribal self-determination, and promotion of commercial dealings between Indians and non-Indians. *Id.* at 179, 186–91.

Extending immunity to Picopa would not further the federal policy seeking to protect tribal assets. Insurance protects the corporate liability, and the corporate charter exonerates the Community from corporate liability. Therefore, the Community's assets are not threatened by refusing to recognize immunity for an Indian corporation that does not meet the law's definition of subordinate economic organization. *Cf. Smith Plumbing*, 149 Ariz. at 536, 720 P.2d at 511 (Feldman, J., dissenting) (if tribal assets are threatened, tribal immunity policies are implicated).

Policies protective of tribal cultural autonomy and self-determination also remain unhindered by permitting jurisdiction here. Picopa's charter shows that it was established for purely commercial reasons and not in any effort to promote, develop, or protect the Community's culture. Cultural autonomy survives. *See Note, supra*, 88 COLUM.L.REV., at 186–87. Neither is the Community's self-determination imperiled by our assertion of jurisdiction. This pri-

vate action based on an off-reservation tort does not in any fashion limit the Community's powers nor the manner in which it exercises those powers. *See id.* at 187–88.

In contrast, the federal government's policy promoting commercial dealings between Indian tribes and non-Indians is furthered by withholding immunity in this case. We realize that, here, Dixon did not voluntarily become involved with Picopa, but we believe that an Indian corporation's successful assertion of immunity, even in a negligence case, may deter persons or entities from entering into contractual relationships with that Indian corporation or any other Indian corporation. Non–Indians will undoubtedly think long and hard before entering into business relationships with Indian corporations that are immune from suit. Note, *supra,* 88 COLUM.L.REV., at 189 (citing *Atkinson v. Haldane,* 569 P.2d 151, 174 (Alaska 1977)). This may well retard a tribe's economic growth. *Id.* Further, Congress's provision for allowing Indian tribes to segregate themselves into governmental and commercial corporate units, *see* note 8, *supra,* arguably implies that "Congress did not intend *all* commercial activity" undertaken by Indian entities be immune from suit. Note, *supra,* 88 COLUM.L.REV., at 190. Thus Congress itself recognized that immunity may have deleterious effects on a tribe's economic development.

The court of appeals held that the mere act of incorporation did not waive tribal immunity. Although that statement is correct, in this instance it overlooks the real issue. The waiver issue does not arise until Picopa first establishes that it has immunity to waive. We hold that Picopa is not a subordinate economic organization within the meaning of *White Mountain Apache* and *S. Unique,* and hence may not assert the Community's tribal immunity. Further, on this record, as a separate corporate entity, Picopa is not entitled to assert immunity in its own right for its off-reservation commercial activities. *See Puyallup* and *Namekagon.* We turn, therefore, to the process issues.

### B. Applicability of Rule 4, Arizona Rules of Civil Procedure

■ The trial court found that it had personal jurisdiction over Picopa when Dixon served process by certified mail on Picopa at the "only address available to [her]." Minute Entry, July 30, 1986, at 1. The trial court never explicitly ruled that Rule 4 applied to an Indian reservation, but the Rule's applicability is implicit in the trial court's decision. The court of appeals' majority opinion never directly addressed the process issues because it based its decision on the tribal immunity defense. We agree with the trial court and hold that the "long-arm" provisions of Rule 4 apply to Indian reservations located within Arizona.

#### 1. *The Rule of* Francisco v. State

Citing *Francisco v. State,* 113 Ariz. 427, 556 P.2d 1 (1976), Picopa contends that it is settled Arizona law that our service of process provisions have no effect on Indian reservations, at least when the party to be served is an Indian living on that reservation. Picopa argued before the trial court that Dixon's only hope of obtaining relief was to secure a Community court summons and serve that summons in accordance with Community law. Reporter's Transcript (RT), Sept. 26, 1986, at 5. Because a Community summons could not confer jurisdiction on an Arizona court, Picopa's argument implies that Dixon could only bring an action in Community courts. Thus, even though Picopa is not clothed with the Community's immunity from suit, Picopa's argument would grant it immunity from Arizona process (and this suit) by virtue of its incorporation under Community law or its location on the Indian reservation. We think not. An Indian corporation, not performing tribal functions and thus lacking immunity, cannot leave the reservation, commit a tort, and then retreat back to the reservation to escape service of process. Justice demands and due process permits Arizona's long-arm rules to apply.

In *Francisco,* we held that a deputy sheriff had no authority to serve process on an Indian while the Indian is on his tribe's reservation. 113 Ariz. at 431, 556

P.2d at 5. We wrote, "Arizona has no authority to extend the application of its laws to an Indian reservation." *Id.* By this language we did not mean to create a "force-field" around Indian reservations through which no Arizona civil process could pass "regardless of the cause of action or fairness of the forum...." Note, *Arizona Appellate Decisions—Indian Law, Service of Process on Indian Reservations: A Return to Pennoyer v. Neff,* 18 ARIZ.L.REV. 741, 754 (1976). We merely held that a *state officer* could not officially serve process on an Indian reservation just as that state officer could not officially serve process in California or New Mexico. *Francisco* does not hold that other forms of service are ineffective on a reservation. Indeed, *Francisco* itself suggests the existence of acceptable alternative methods of civil service on an Indian reservation. 113 Ariz. at 428 n. 1, 556 P.2d at 2 n. 1 (Arizona process could be served by an Indian officer);[14] Note, *supra,* 18 ARIZ.L.REV., at 754–55; *cf.* F. COHEN, *supra,* at 361 ("If a state court has subject matter jurisdiction over a claim against an Indian, service in Indian country by either tribal police or a private server should be valid."). *Francisco* does not invalidate the service of process here. Providing they have subject matter jurisdiction, if Arizona courts have power to authorize service of Arizona civil process in foreign countries, *see* Rule 4(e)(6), surely they have power to extend service of Arizona civil process to defendants located on Indian reservations.

### 2. *Applicability of the "Long–Arm" Provision*

Treating an Indian reservation as "out-of-state" for service of process problems does not unreasonably infringe on Indian sovereignty any more than out-of-state,

long-arm service unreasonably violates our sister states' sovereignty. Recognized authorities and commentators advocate the use of state long-arm provisions to secure personal jurisdiction over Indians residing on the reservation. Canby, *Civil Jurisdiction and the Indian Reservation,* 1973 UTAH L.REV. 206, 226; *see* Note, *supra,* 18 ARIZ.L.REV., at 755 & n. 112; *cf.* F. COHEN, *supra,* at 361. Utilization of a long-arm provision is particularly appropriate because its use normally depends on the state court having subject matter jurisdiction, avoids imposition of state court jurisdiction over reservation-based activity, and minimizes intrusions on tribal sovereignty. Canby, *supra,* 1973 UTAH L.REV., at 226; *State Securities, Inc. v. Anderson,* 84 N.M. 629, 506 P.2d 786 (1973) (service by long-arm statute does not interfere with tribal sovereignty).[15]

Moreover, treating an Indian reservation as an out-of-state jurisdiction is not a concept alien to Arizona law. In *In re Estate of Lynch,* 92 Ariz. 354, 377 P.2d 199 (1962), we held that a will admitted to probate in Navajo Tribal Court was a will "admitted to probate in another state or foreign country" for Arizona probate purposes. *Id.* at 357, 377 P.2d at 201. We reasoned that an Indian reservation was not "strictly speaking" a sister state or foreign country, but it was a separate jurisdiction. *Id.* Likewise, here we see no alternative except to treat Indian reservations located in Arizona as separate jurisdictions for long-arm purposes. Therefore, because there is subject matter jurisdiction, if Dixon complied with Arizona's long-arm provision, the state courts may gain personal jurisdiction over Picopa, just as they might if Picopa was incorporated and domiciled in a sister state or foreign country.[16]

---

**14.** Service of an Arizona summons by an Indian officer would have granted the Arizona courts personal jurisdiction. *See* Rule 4(e)(2)(b).

**15.** Thus, even though state court judgments against an Indian individual or corporation would have to be enforced in tribal court, Canby, *supra,* 1973 UTAH L.REV., at 227, or, as in this case, by execution or garnishment against the Indian's off-reservation assets, the difficulty of enforcement should not deprive state courts

of asserting personal jurisdiction over an Indian party necessary to litigate a claim.

**16.** We do not intimate that service pursuant to Rule 4(e)(2)(a) is the exclusive method of serving process on an Indian reservation. We note the possibility of service under A.R.S. §§ 10–115 (service of process on foreign corporations) or 28–503 (service on nonresident motorists). However, we express no opinion whether those

### 3. Compliance with Rule 4(e)(2)(a)

Apparently relying on Rule 4(e)(2)(a), Dixon sent the complaint and summons via certified mail to Picopa Construction Co., Inc., in care of the Salt River Pima Indian Reservation, Scottsdale, Arizona. Dixon obtained this address from the police accident report. Earlier in this opinion, we described Dixon's attempts to secure a better address for Picopa. *See* Part I, *supra.* The trial court ruled that Dixon had served process "to the only address available to the plaintiff" and upheld the service of process by certified mail. Minute Entry, July 30, 1986, at 1.

Rule 4(e)(1) allows service by mail when the defendant is "a corporation incorporated under the laws of any other state or foreign country which has no legally appointed and constituted agent in this state." As we held above, even though Picopa was not incorporated under the laws of "another state or foreign country," we will treat it as if it had been so. We have noted that Picopa did not file the name of a statutory agent for service of process with the Arizona Corporation Commission. Thus, Rule 4(e)(1) applies.

Rule 4(e)(2) allows service by mail, return receipt requested, on a foreign corporation that has "caused an event to occur in this state out of which the claim which is the subject of the complaint arose." Picopa does not challenge service of process on this ground.

Rule 4(e)(2), however, mandates compliance with Rule 4(d)(6) when the out-of-state defendant is a corporation. Rule 4(d)(6) requires service of process on the corporation's officers, a general or managing agent, or "to any other agent authorized ... by law to receive service of process." Picopa and Home contend that Cecilia Nash was not an agent within the meaning of this rule.

We cannot, however, decide if Nash was an "agent authorized by law" by merely interpreting our rule's language. Due process commands that "notice be reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action...." *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). Thus, we must not only decide if Nash was Picopa's agent within the meaning of the rule, but also whether service on that agent would violate the United States Constitution.

Nash, a Community employee, was the receptionist at the Community's finance office. In her affidavit, she verified her signature that appeared on the return receipt. Thus, it is undisputed that she received the mailings. She further swore that it was her job to receive all mail addressed to the Community, including certified mail. After she received the mail, it was sorted and delivered to the appropriate office. The affidavit does not inform us who actually sorts and delivers the mail.

The Community was Picopa's sole stockholder. Dixon mailed the summons and complaint to the only address discoverable with due diligence—the Community's address. Neither Picopa nor Home has ever argued that any other address existed for Picopa or that any person other than Nash was assigned to receive Picopa's mail at the Community's office. Moreover, because a Community ordinance dissolved Picopa by the time Dixon attempted service,[17] it is improbable, even with herculean efforts, that Dixon would have found any other address. Even if, as counsel for Home and Picopa argued to the trial court, Dixon addressed the certified mail to the president of Picopa rather than just to Picopa, the envelope would still have arrived at the same address and Nash would still have received it. Under the circumstances of this case, we hold that Rule 4(d)(6) allows a plaintiff to serve process on a sole stockholder who shares the same address as its corporation, and where the corporation, through its insurer, was aware of the filed complaint. *See Walker v. Dallas,* 146

two methods of service would have been valid in this case.

**17.** The ordinance establishing Picopa provided that Picopa could only be dissolved by a repealer ordinance. SRO–85–84 ¶ E.

Ariz. 440, 444, 706 P.2d 1207, 1211 (1985) (allowing alternative service on absent non-resident motorist/defendant where insurer has notice of lawsuit). The rules relating to service of process should not be construed to halt an otherwise meritorious lawsuit "by the simple expedience of [the defendant] leaving the state and avoiding service of process." *Id.*

Nor do principles of due process invalidate the service of process in this case. Dixon diligently attempted to find a better address. The search was futile because the Community's address was Picopa's address; so far as this record shows, Dixon would never find a better or different address. Further, Picopa's own employee supplied that address to the police officer who filled out the accident report. Dixon had no reason to doubt the validity of an address given by Picopa's employee. A plaintiff need not retain the Baker Street Irregulars to effectuate service, especially when the defendant himself gives an address where he may be located. *See Walker*, 146 Ariz. at 442-43, 445, 706 P.2d at 1209-10, 1212 (plaintiff's attempt to serve absent nonresident motorist/defendant by mailing process at the last known address supplied by defendant in police accident report combined with efforts to discover better address constitutes due diligence); *Dobkin v. Chapman*, 21 N.Y.2d 490, 505, 289 N.Y.S.2d 161, 173-174, 236 N.E.2d 451, 460 (1968) (process mailed to address given by defendant comports with due process) (citing *Mullane*, 339 U.S. at 314, 70 S.Ct. at 657). Therefore, because under the circumstances here Dixon sent notice "reasonably calculated" to apprise Picopa of the impending action against it, the service of process was valid. *Mullane*, 339 U.S. at 314, 70 S.Ct. at 657.

## C. Remaining Issues

Home contends that the trial court erroneously denied it a hearing as required by A.R.S. § 12-1580. Home asserts that at this hearing it would have made the following argument:

> HOME COUNSEL: [M]y objection at the hearing on Writ of Garnishment would be that the policy of insurance only binds the Home Company to pay those debts of the insured which it is legally obligated to pay.... Since it is our position that even if you are ruling that this judgment is valid, [the plaintiff's attorney] can't collect it. And the reason he can't collect it is because it is an Indian entity, and therefore, he would need to domesticate that judgment in the Indian Court. Since it is not ... legally collectible, this entity isn't legally obligated to pay. Since it is not legally obligated to pay, there remains a significant issue as to whether he can garnish the insurance carrier.

RT, Sept. 26, 1986, at 13-14. The trial court overruled this objection, ruling that Home's amended answer to the writ of garnishment admitted all the facts necessary to entitle Dixon to collect from Home.

■ We turn first to Home's contention that it did not receive the hearing required by A.R.S. § 12-1580. The trial court's minute entry reflects that a hearing was held on July 22, 1986; no court reporter was present. The minute entry order denying the motion to quash and the motion to set aside the default judgment also reflects that at the July 22 hearing Home raised the arguments listed in its June 27 objection to the writ of garnishment. On September 15, 1986, Home again objected to judgment on the writ, requested a hearing, and again cited § 12-1580.[18] The court held the requested hearing on September 26, 1986, in conjunction with a motion to reconsider, and it was at this hearing that Home first raised its domestication argument.

Thus, the trial court did not deny Home any of its statutory rights. Even though the July 22 hearing was not denominated as such, the trial court provided Home with an opportunity to present arguments supporting its objections to the writ of garnishment. The trial judge was not re-

18. We note that a statute specifically provides for a hearing before the entry of judgment on the writ. *See* A.R.S. § 12-1584.

quired to grant Home a second hearing on its objections to the writ.

Home complains further that it was denied an "opportunity to be heard on all objections to the writ prior to the entry of Judgment [on the writ]." Appellant's Opening Brief at 23. This is simply not so. Home had the opportunity to raise its domestication arguments at the July 22 hearing but failed to do so. Nothing in the record indicates that the trial court precluded this particular argument at the July 22 hearing.

Even if we assume that the trial court erred in depriving Home of a § 12–1580 hearing, or its right to make the domestication argument, such an error would have been harmless. The domestication argument is meritless. Home cites no law supporting its contention that a judgment creditor must domesticate the judgment in the debtor's jurisdiction before he may garnish the debtor's indemnitor—at least not when the latter is located within the creditor's jurisdiction. *See* A.R.S. § 12–1572 (listing statutory requirements for application for writ of garnishment). Home's amended answer to the writ of garnishment admitted that the policy covered Dixon's injuries. Home thus was Picopa's indemnitor. Home does business within Arizona and its obligation to indemnify Picopa against Dixon's claim could be reached in Arizona. The trial court properly granted judgment against the garnishee.

## IV. CONCLUSION AND DISPOSITION

We conclude, therefore, that Picopa Construction Co. is not a subordinate economic organization within the meaning of Arizona law and thus may not assert the Community's immunity. The corporation has no immunity itself for its off-reservation torts. We also hold that, under the facts of this case, process was properly served on Picopa. We find no error in the garnishment proceedings against Home Insurance Co.

Accordingly, we vacate the court of appeals' opinion. We affirm the judgment against Picopa on the complaint, the order denying the motions to set aside the default, and the judgment entered against Home on the return of the writ of garnishment.

GORDON, C.J., and CAMERON and MOELLER, JJ., concur.

HOLOHAN, J., retired before the decision of this case.

CORCORAN, J., did not participate in the determination of this case.