BYE, Circuit Judge,
dissenting.
I respectfully dissent from the holding as to the Tribal Court lacking jurisdiction over the three tribal members’ direct suit against Amerind, a holding the majority justifies on the grounds Amerind is entitled to tribal immunity.
First, I believe Amerind waived its immunity in the contract between itself and the Turtle Mountain Housing Authority (TMHA). Second, even assuming Amerind did not waive its immunity, the procedural posture of this case demands us to allow the three tribal members an opportunity to conduct discovery to determine whether Amerind adopted a corporate resolution waiving its immunity, or otherwise waived its immunity with the requisite clarity by means of its conduct. Finally, I believe the result in this case is perverse. As a condition of receiving federal funds, Congress mandated tribes and tribal housing authorities be required to purchase insurance. As a practical matter, requiring the purchase of insurance is perhaps the consummate indication Congress intended tribes and tribal housing authorities would be subject to suit. The fact that we now recognize Amerind—the commercial entity created for the very purpose of fulfilling such Congressional mandate— to itself be immune from suit, may require the Supreme Court to re-examine the “wisdom of perpetuating the doctrine [of tribal *692 immunity].” Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 758, 118 S.Ct. 1700, 140 L.Ed.2d 981 (1998).
I
While I recognize a waiver of tribal immunity must either be “unequivocally expressed” by Congress, Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S.Ct. 1670, 56 L.Ed,2d 106 (1978), or “waived, with the requisite clarity” by the tribe itself, C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Okla., 532 U.S. 411, 418, 121 S.Ct. 1589, 149 L.Ed.2d 623 (2001), I believe the unique circumstances encountered in this case do indicate Amerind waived any tribal immunity it may have enjoyed.
The arbitration clause in the relevant insurance policy expressly states coverage disputes between Amerind and the TMHA were arbitrable “in the tribal jurisdiction in which the address shown in the Certificate of Coverage is located.” The arbitration clause further provided local tribal laws were applicable, and an arbitrator’s decision could be “appealed to a tribal court of competent jurisdiction.” In C & L Enterprises, the Supreme Court held a tribe clearly waived its tribal immunity by entering into a contract containing an arbitration clause in which the tribe expressly agreed to arbitrate disputes arising under the contract and to allow an arbitration award to be enforced “in any court having jurisdiction thereof.” 532 U.S. at 414, 121 S.Ct. 1589. The Court explained it was resolving a conflict between “several state and federal courts [which] held that an arbitration clause, kin to the one now before us, expressly waives tribal immunity from a suit arising out of the contract ” and some courts which held a tribe had not waived its immunity despite the presence of such a clause. Id. at 417-18, 121 S.Ct. 1589 (emphasis added). In resolving the conflict, the Court cited with approval the following reasoning from the Supreme Court of Alaska:
[W]e believe it is clear that any dispute arising from a contract cannot be resolved by arbitration, as specified in the contract, if one of the parties intends to assert the defense of sovereign immunity. ... The arbitration clause ... would be meaningless if it did not constitute a waiver of whatever immunity [the Tribe] possessed.
Id. at 422, 121 S.Ct. 1589 (quoting Native Vill. of Eyak v. GC Contractors, 658 P.2d 756, 760 (Alaska 1983)) (emphasis added).
The Eighth Circuit had addressed this same issue prior to C & L Enterprises, also deciding a tribe clearly waived its immunity “with respect to claims under the contract” by entering into an agreement containing an arbitration clause, concluding “[b]y definition such disputes could not be resolved by arbitration if one party intended to assert sovereign immunity as a defense- The parties clearly manifested their intent to resolve disputes by arbitration, and the Tribe waived its immunity with respect to any disputes under the contract.” Rosebud Sioux Tribe v. Val-U Constr. Co. of S.D., Inc., 50 F.3d 560, 562-63 (8th Cir.1995) (emphasis added).
Under Rosebud, Sioux Tribe and C & L Enterprises, the arbitration clause in the insurance policy issued by Amerind clearly manifests Amerind’s intent to waive immunity with respect to any disputes arising under the contract (i.e., coverage disputes) between itself and the TMHA.
The tribal court lawsuit did not, however, begin as a coverage dispute between Amerind and the TMHA; it was commenced as a wrongful death action filed by the three tribal members against the TMHA. Amerind was later added to the suit and, pursuant to tribal law, the suit *693 became a direct action between Amerind and the three tribal members seeking insurance coverage up to the amount purchased by the TMHA. It was at that point Amerind sought to assert a sovereign immunity defense, which defense was rejected by the tribal court. Because the tribal lawsuit did not start as a coverage dispute between Amerind and the TMHA, but is now a coverage dispute, the question remains whether Amerind’s clear waiver of immunity with respect to coverage disputes should apply. I believe, under the unique facts encountered in this case, such waiver still applies.
In addition to the arbitration clause, the policy also contained a clause stating the policy would conform to tribal law whenever the policy conflicted with such tribal law. As noted above, tribal law provides insurers of a tribal entity to be subject to direct actions when the tribal entity purchases the insurance pursuant to a mandate of federal law, and the federal law reflects an intent to provide remedies to third parties injured by the tribe. The policy’s prohibition on direct actions against an insurer (before the insured’s obligation to pay is finally determined) conflicts with this principle of tribal law. Thus, the conforming clause applies. Amerind agreed the policy would conform to tribal law.
The result is this coverage dispute is being litigated directly between the tribal members and Amerind rather than between the TMHA and Amerind (or as a personal injury suit between the tribal members and the TMHA). In other words, Amerind’s own contract operates in a manner in which coverage disputes may be resolved directly between itself and third party claimants, rather than between itself and the TMHA. This fact, coupled with Amerind’s waiver of immunity “with respect to any disputes under the contract,” Rosebud Sioux Tribe, 50 F.3d at 563, indicates Amerind waived its tribal immunity under the unique circumstances involved in this case.
II
Even assuming the arbitration clause does not operate as a clear waiver of immunity, I believe the procedural posture of this case requires us to remand it to allow the three tribal members to conduct jurisdictional discovery in the district court.
Amerind initiated this federal declaratory judgment action against the three tribal members and, as the majority acknowledges, voluntarily waived its tribal immunity in federal court by doing so. See Rupp v. Omaha Indian Tribe, 45 F.3d 1241, 1244-45 (8th Cir.1995) (concluding a tribe waived its sovereign immunity by filing an action in federal court asking for something more than injunc-tive relief). Significantly absent from Amerind’s complaint for declaratory relief is any claim whatsoever as to the tribal court lacking jurisdiction over Amerind because of tribal immunity. Such was not a ground upon which Amerind claimed a right to declaratory" relief in federal court. In fact, Amerind never raised the issue of tribal immunity in the district court at any time between the filing of its complaint on September 4, 2007, and its notice of appeal to the Eighth Circuit on December 9, 2008.
The issue of tribal immunity was not raised in this federal action until October 13, 2009, when this court itself asked the parties to be prepared to address certain questions at the oral argument scheduled and held nine days later on October 22, 2009. Included among those questions were some pertaining to the issue of Amerind’s immunity in tribal court. While some of our questions asked about the absence in the record of a corporate reso *694 lution waiving Amerind’s immunity as to the three tribal members’ suit, we never directly asked Amerind whether such a resolution had, in fact, ever been adopted.
In addressing our questions, Amerind renewed the unsuccessful argument it had pursued in tribal court, which was based on its current corporate charter’s requirement that it must pass a resolution waiving immunity with respect to any particular lawsuit. The three tribal members responded by explaining the absence of a resolution under Amerind’s current charter was irrelevant, because the current charter did not become effective until April 15, 2004, well after the operative events involved in this dispute.[11] The tribal members further argued, to the extent the applicable charter may be relevant, it was not part of this court’s record, the district court’s record, or the tribal court record. The tribal members argued Amerind should be deemed to have waived its immunity by abandoning the defense in the district court proceedings, thereby depriving the tribal members of the opportunity to conduct discovery and develop the factual predicate necessary to determine whether Amerind waived its immunity.
While I would decline the tribal members’ request to find Amerind waived its immunity by failing to raise the issue in the district court, see, e.g., In re Prairie Island Dakota Sioux, 21 F.3d 302, 304 (8th Cir.1994) (recognizing the jurisdictional nature of tribal immunity); Hagen v. Sisseton-Wahpeton Cmty. Coll., 205 F.3d 1040, 1044 (8th Cir.2000) (allowing parties to raise tribal immunity for the first time on appeal), I nonetheless believe a remand is both necessary and appropriate.
As part of the grounds for concluding the tribal court lacked jurisdiction over Amerind in the tribal court, the majority relies upon the lack of evidence in the federal court record showing that Amerind’s Board of Directors ever adopted a resolution waiving Amerind’s immunity. However, the three tribal members never had a reason to look for that evidence (which may actually exist), because Amerind never raised the issue of immunity in the district court. Since Amerind was the party which failed to raise the issue in district court, it should not benefit from an incomplete factual record on the issue. Under these circumstances, the appropriate remedy should be to send this case back to the district court and allow the tribal members to conduct discovery. See Miller v. First Serv. Corp., 84 F.2d 680, 683 (8th Cir.1936) (“If ... a grave doubt of jurisdiction arises, we may remand to the District Court for hearing and determination upon the question of jurisdiction.”); see also United States ex rel. Miss. Rd. Supply Co. v. H.R. Morgan, Inc., 528 F.2d 986, 987 (5th Cir.1976) (indicating “it is vital to a proper determination of [a] jurisdictional issue for the record to be properly developed” and a remand is appropriate where the record is not properly developed).
Ill
Finally, I am compelled to comment on what I view as a perverse result. Amerind, a commercial entity created for the very purpose of insuring tribal entities, is permitted to rely upon tribal immunity as a ground for avoiding its contractual obligation to provide insurance coverage.
*695 Indian housing authorities are required by federal law to carry liability insurance in order to receive grant money under the Native American Housing Assistance and Self-Determination Act (NAHASDA), 25 U.S.C. §§ 4101-4243. Amerind is an insurance risk pool initially created by a collection of tribes at the encouragement of the United States Department of Housing and Urban Development (HUD) and subsequently issued a federal corporate charter pursuant to 25 U.S.C. § 477. Thus, Amerind’s very creation and existence arises from the Congressional mandate which directs Indian tribes and tribal housing authorities protect themselves from tort liability (i.e., lawsuits) as a condition of their receipt of federal funds. It seems to me, therefore, that Congress necessarily envisioned the tribes and tribal housing authorities would be subject to suit, and by logical extension their insurer would likewise be subject to suit. If the insuring entity must itself consent to be sued before the insurance is operative, the condition Congress placed on the receipt of NAHASDA grant money seems tenuous at best, if not entirely illusory.
Prior to the Supreme Court’s decision in Kiowa, Tribe, some courts distinguished between the governmental functions of tribes and the commercial activities of tribal corporations when determining whether a particular tribal corporation was immune from suit. See, e.g., Dixon v. Picopa Constr. Co., 160 Ariz. 251, 772 P.2d 1104, 1109-11 (1989) (rejecting a tribal construction corporation’s claim of immunity in part because the corporation did not aid the tribe in carrying out tribal governmental functions), abrogated by Kiowa Tribe, as recognized in Cash Advance & Preferred Cash Loans v. State, 242 P.3d 1099, 1110 n. 12 (Colo.2010). One of the relevant factors in determining whether a commercial tribal corporation might enjoy the tribe’s governmental immunity was whether the tribal corporation had purchased insurance coverage. See Dixon, 772 P.2d at 1110 (“The purchase of liability insurance is some evidence that the [Tribe] expected its corporation to be liable for its torts.”). Here, the argument against extending tribal immunity to shield Amerind seems even stronger given the fact Amerind is actually an insurer and not just an insured.
While I acknowledge Kiowa Tribe renders irrelevant the distinction between governmental functions and commercial activities when determining whether a particular tribal entity enjoys immunity, I find it very significant the Supreme Court did not address the distinction between tribal business corporations formed under 25 U.S.C. § 477 and tribal governments organized under 25 U.S.C. § 476. In this case, Amerind’s corporate charter was issued pursuant to § 477, not § 476. There is some support for the argument that when Congress adopted the Indian Reorganization Act (IRA) in 1934, it did not intend tribal business corporations formed under § 477 to have the same immunity that tribal governments formed under § 476 would have. See Gaines v. Ski Apache, 8 F.3d 726, 729 (10th Cir.1993) (recognizing the distinction between a tribe’s governmental entity created under § 476 and a tribal business corporation formed under § 477); Veeder v. Omaha Tribe of Neb., 864 F.Supp. 889, 900 (N.D.Iowa 1994) (pre-Kiowa Tribe case noting decisions wherein courts held tribal corporations formed under § 477, as opposed to tribal governments organized under § 476, waived sovereign immunity); see also William V. Vetter, Doing Business with Indians and the Three “S”es: Secretarial Approval, Sovereign Immunity, and Subject Matter Jurisdiction, 36 Ariz. L. Rev. 169, 175 & n.35 (1994) (distinguishing between tribal governments *696 formed under § 476 and tribal business corporations formed under § 477, and noting Congress added the latter section to the IRA “because of congressional concern that non-Indians would not do business with tribal governments that are immune from suit.”) (citing Hearings on H.R. 7902, 73d Cong., 2d Sess. 90-100 (1934) and S.Rep. No. 1080, 73d Cong., 2d. Sess. (1934)). The argument against extending tribal immunity to a § 477 corporation seems particularly compelling when the commercial activity in which the corporation is engaged is providing insurance against tort liability, a purpose utterly at odds with the concept of immunity from suit.
In Kiowa Tribe, the Supreme Court questioned the “wisdom of perpetuating the doctrine [of tribal immunity]” noting it developed “almost by accident” and “with little analysis.” 523 U.S. at 756-58, 118 S.Ct. 1700. The Supreme Court suggested the continued recognition of tribal immunity may no longer be “necessary to protect nascent tribal governments from encroachments by States” and may “extend! ] beyond what is needed to safeguard tribal self-governance” in our current commerce, where “[t]ribal enterprises now include ski resorts, gambling, and sales of cigarettes to non-Indians.” Id. at 758, 118 S.Ct. 1700. The Court acknowledged that “[i]n this economic context, immunity can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims.” Id. Ultimately, however, the Court “deeline[d] to revisit [its] case law” and instead chose to “defer to the role Congress may wish to exercise in this important judgment [to abrogate the doctrine of tribal immunity].” Id. at 758, 760, 118 S.Ct. 1700.
Where, as here, the already infirm concept of tribal immunity is extended so far as to shield a corporate entity whose very existence is at odds with the concept of immunity, it seems perhaps the time is now upon us to abrogate the doctrine.
IV
For the reasons expressed above, I respectfully dissent.

. The fire giving rise to the tribal court lawsuit occurred on October 19, 2002. The applicable insurance policy was in effect from January 1, 2002, through December 31, 2002. The three tribal members filed suit on January 23, 2003. Amerind was added to the lawsuit on September 5, 2003.